**UNITED STATES, Appellee,**

v.

**Juan CAMILO MONTOYA,
Defendant, Appellant.**

No. 89–2177.

United States Court of Appeals,
First Circuit.

Heard Sept. 14, 1990.

Decided Nov. 1, 1990.

Victor Aronow, Boston, Mass., for appellant.

Margaret E. Curran, Asst. U.S. Atty., Providence, R.I., Lincoln C. Almond, U.S. Atty., was on brief, for defendant, appellee.

Before TORRUELLA, Circuit Judge, BOWNES, Senior Circuit Judge, and CYR, Circuit Judge.

BOWNES, Senior Circuit Judge.

This is the case of the absent defendant. On August 7, 1985, defendant-appellant Juan Camilo Montoya, Luis Norbert Gomez, Omar Vanegas, Ruben Dario Echeverry, Jr., and Carlos Mario Montoya were indicted on two charges: Count I, conspiracy to distribute and possess with intent to distribute an excess of one kilogram of cocaine; Count II, possession with intent to distribute one kilogram "or more" of cocaine. The implicated statute is 21 U.S.C.

§ 841(a)(1) and (b)(1)(A). Norbert Gomez was also indicted on two other counts involving one and two ounces of cocaine. His trial and that of Carlos Mario Montoya, the uncle of Juan Camilo Montoya, were severed. Camilo Montoya was the only one of the five defendants released on bail prior to trial. Subject to travel restrictions and the duty to report daily to the United States Marshal, Camilo Montoya was placed in the custody of Mr. and Mrs. Melvin Rivera, who had volunteered to accept him. Camilo Montoya also executed a $1,000 personal recognizance bond.

The trial of Camilo Montoya, Vanegas and Dario Echeverry was scheduled to start on Friday, November 8, 1985, at 10 a.m. Defendant did not appear at the courthouse at the scheduled time for start of the trial. His attorney informed the court that defendant had not been at the home of his custodian at all the prior night. Defendant's attorney also informed the court that there could be no question that defendant had known for more than two weeks of the scheduled date and time of the start of the trial. The court issued an arrest warrant for defendant and postponed the start of the trial until the following Tuesday. Defendant was not located in the interim and did not appear on Tuesday. After instructing the jury on the situation, the court proceeded with trial in defendant's absence.[1]

Camilo Montoya and the two other defendants were convicted on both counts, conspiracy to possess and distribute cocaine and possession with intent to distribute cocaine. There are three issues on appeal: whether the evidence was sufficient for the conviction; whether the district court should have ordered a new trial; and whether the jury instructions on defendant's failure to appear for trial were erroneous. We affirm appellant's conviction.

## THE EVIDENCE

■ We review the evidence in the light most favorable to the government, including all legitimate inferences to be drawn therefrom, to determine whether a rational trier of fact could have found defendant guilty beyond a reasonable doubt. *United States v. Blair*, 886 F.2d 477, 478 (1st Cir.1989).

■ The case started with two telephone calls in the morning of August 7, 1985, between Norbert Gomez and a DEA undercover agent, Frank DiCarlo. Gomez offered to sell and DiCarlo agreed to buy two kilos of cocaine for $88,000. It was agreed that the sale would take place the same day at 1:30 p.m. in the parking lot next to Howard Johnson's Restaurant in Pawtucket, Rhode Island. The telephone conversations, which were recorded on tape, were in Spanish. Immediately after DiCarlo had reported the agreement, steps were taken for surveillance of the parking lot and the surrounding area by DEA agents and local police. The surveillance team arrived on the scene at approximately 1:20 p.m.

Two automobiles entered the parking lot shortly before 1:30 p.m. One was a white or light-colored Plymouth and the other a Ford Escort wagon with New Jersey plates. The Ford was directly behind the Plymouth. The cars parked about five parking spaces apart.

The Plymouth was driven by Vanegas. Gomez was its sole passenger. The Ford was driven by Carlos Mario Montoya. Defendant was in the front passenger seat. Echeverry was seated in the rear, behind defendant.

Gomez got out of the Plymouth carrying a white plastic bag with handles and walked towards a bank of open phone booths. A member of the surveillance team, John Zincone, went to a phone booth about three feet away from the one occupied by Gomez. Zincone could see the outline of two brick-shaped objects, approximately eight inches by ten inches, within the bag. While Gomez was at the phone booth, defendant got out of the Ford and

---

**1.** The transcript of the sentencing hearing shows that defendant was subsequently arrested in Anchorage, Alaska, after selling one half of a pound of cocaine to an undercover police officer. At the time of his arrest, he possessed an additional pound of cocaine and a nine-millimeter semi-automatic pistol.

walked over to Gomez. Zincone could hear them talking in Spanish but could not understand what they said. Defendant returned to the Ford. Gomez went back to the Plymouth, swinging the bag as he walked. Zincone informed the other members of the surveillance team by radio that Gomez had the cocaine.

Within a short time of returning to the Plymouth—about two minutes—Gomez got out again and with the plastic bag in his hand went directly to the Ford. He leaned into the right front passenger window where defendant was seated and appeared to be talking to one or more of those in the car. After an appreciable lapse of time—several minutes—Gomez stepped back from the car. He no longer had the plastic bag. The Ford started up and drove away.

As the Ford was leaving, the undercover agent, DiCarlo, drove into the parking lot. Gomez saw him and got into his car. He proceeded to give DiCarlo hell for being late, pointing out that a cocaine transaction must be completed as scheduled. Gomez told DiCarlo that he had been there, as agreed, with the two kilos of cocaine at 1:30, that the three others involved had become nervous when DiCarlo did not show up on time, that he had given the cocaine back to them, and they had left to stash it away. DiCarlo concocted a story to the effect that his girlfriend was standing by with the money, and that if Gomez could get the cocaine back, he could meet him in the parking lot and make the purchase. Gomez agreed, stating that it would not be a problem to get the cocaine. Gomez then returned to the Plymouth and Vanegas drove it out of the parking lot.

DiCarlo then radioed the DEA agent in charge of the operation, Terry Parnham, and told him that the cocaine was in the Ford, that it should be stopped, and its three occupants arrested. Parnham and several other DEA agents had followed the Ford when it left the parking lot. After Parnham received the message from DiCarlo he called the Pawtucket Police Department and requested that the Ford be stopped by marked police cruisers. By coincidence, the Ford was stopped a short distance from the Pawtucket police station. The three occupants—defendant, Carlos Montoya and Echeverry—were arrested.

The white plastic bag was found on the floor behind the driver's seat with a denim jacket covering it. It was seized at the time of the arrest. As suspected, it contained two one-kilo bricks of cocaine which showed on testing to have a purity of ninety-three percent. After the Ford was taken to the police station it was searched and a triple beam balance scale was found in the rear cargo area. A triple beam balance scale is one of the tools of the trade for drug dealers.

Gomez testified at the trial under a grant of immunity. He had been tried and convicted prior to the trial of defendant, Vanegas and Echeverry. Although his testimony was inconsistent and, at times, contradictory and confusing, he insisted consistently that defendant came over to him at the phone booth and asked what was going on and where was the guy from Boston (DiCarlo had told Gomez on the phone that he was calling from Boston). Gomez also testified that he handed the cocaine to defendant when he brought the plastic bag over to the Ford and that defendant said "forget it" as the Ford pulled away.

We have no difficulty finding that this evidence was more than sufficient for a jury to conclude beyond a reasonable doubt that defendant was part of a conspiracy to possess and distribute cocaine and that defendant, along with the others, possessed cocaine with the intent to distribute it.

Our review of the evidence also compels the conclusion that the district court did not abuse its discretion in denying defendant's motion for a new trial. There were no grounds for a new trial.

## THE JURY INSTRUCTIONS

 Before we consider the jury instructions on defendant's failure to appear at the trial, we set forth the evidence on this issue. Melvin D. Rivera testified that defendant had resided with him and his wife since defendant had been put in their custody. After explaining that he and his

wife had volunteered to act as custodians and acknowledging their duties as such, Rivera testified that the last time he saw defendant was the day before the start of the trial at about 5:30 p.m. Rivera explained that he was at his daughter's house fixing a ceiling and defendant had come over to give him a hand. Prior to the night before the trial, defendant had never stayed out all night. Rivera testified that defendant that defendant had, up to this time, always spent the evenings with his wife or him at their home. Rivera was certain that defendant knew of the date and time that his trial was to start. Rivera ended his testimony by stating that neither he nor his wife had heard from the defendant since the evening of November 7, 1985, the day before the trial was scheduled to start.

The jury instructions in issue were the following:

> I told you at the outset of this trial that a Defendant in a criminal trial has no burden to prove his innocence, indeed, to prove or disprove anything. The burden of proof is on the government and consistent with that, a Defendant has a constitutional right to elect not to testify in his own defense. The Defendant Juan Camilo Montoya has not testified and I instruct you that you may not draw an inference of guilt from the fact that that Defendant did not testify. In point of fact, no inference of any kind can be drawn simply from the failure of a Defendant to testify.
>
> There has been some mention in this case as to the fact that the Defendant Juan Montoya is not present. The fact that Mr. Montoya has not been present for the trial in no way lessens your obligation to consider his case fairly and objectively as you would with any criminal Defendant, in no way lessens the government's burden of proof and in no way erodes his right to a fair trial. If you find that Mr. Montoya has intentionally absented himself from these proceedings, I do instruct you that the law holds that the intentional flight of a Defendant after he has been accused of a crime that has been committed while not sufficient in itself to establish his guilt,

is a fact which, if proved, may be considered by the jury in the light of the other evidence in the case in determining the guilt or lack of guilt of the Defendant who has fled. Whether or not evidence of flight shows a consciousness of guilt and the significance to be attached to any such evidence are matters exclusively within your province as jurors.

Because there was no objection to the jury instructions we review only for plain error. *United States v. De La Cruz*, 902 F.2d 121, 122 (1st Cir.1990); *United States v. Boylan*, 898 F.2d 230, 249 (1st Cir.1990).

The law in this circuit on flight instructions has been stated as follows: "Evidence of the accused's flight may be admitted at trial as indicative of a guilty mind, so long as there is an adequate factual predicate creating an inference of guilt of the crime charged." *United States v. Hernandez–Bermudez*, 857 F.2d 50, 52 (1st Cir.1988). *See also United States v. Hyson*, 721 F.2d 856, 864 (1st Cir.1983); *United States v. Grandmont*, 680 F.2d 867, 869 (1st Cir. 1982). To argue as defendant does that there was not an adequate factual predicate creating an inference of guilt is to ignore the evidence. The flight instruction had a solid evidentiary basis and the instruction itself was a correct statement of the law. There was no error, plain or otherwise.

*Affirmed.*