**UNITED STATES, Appellee,**

v.

**Jeffrey FORD, Defendant, Appellant.**

**No. 93–1867.**

United States Court of Appeals,
First Circuit.

Heard March 8, 1994.
Decided April 28, 1994.

David P. Hoose, by Appointment of the Court, with whom Katz, Sasson and Hoose, Springfield, MA, was on brief, for appellant.

Kevin O'Regan, Asst. U.S. Atty., Springfield, MA, with whom Donald K. Stern, U.S. Atty., Boston, MA, was on brief, for appellee.

Before BOUDIN, Circuit Judge, COFFIN, Senior Circuit Judge, and PETTINE,* Senior District Judge.

PETTINE, Senior District Judge.

Defendant Dr. Jeffrey M. Ford was charged under a four count indictment for violations of the drug laws. He was convicted on all counts and sentenced to fifty-one months imprisonment and three years of supervised release. Dr. Ford raises three issues on appeal: the district court erred in denying a motion to suppress evidence seized during a warrantless search; the district court erred in admitting into evidence a book entitled *Secrets of Methamphetamine Manufacture;* and there is insufficient evidence to support a conviction for possession of cocaine with intent to distribute. For the reasons stated below, we reject Dr. Ford's arguments and affirm the district court.

## I.

The relevant facts are as follows. In March 1991, the Postmaster of the South Hadley Post Office in Massachusetts notified Postal Inspector Terrence Loftus that on several occasions Dr. Ford had purchased postal money orders and sent them via Express Mail to an address in Arizona. After a few days, Ford would receive an Express Mail package from a person named R. Cunningham with a fictitious California return address. Inspector Loftus asked to be informed of the next such occurrence.

On July 22, 1991, the postmaster informed Inspector Loftus that Dr. Ford purchased additional money orders and sent them to the address in Arizona. On July 23, 1991, an Express Mail package arrived for Dr. Ford from R. Cunningham at the Los Angeles address. Inspector Loftus removed the package from the mail stream and had it examined by a trained narcotics detection dog. The dog alerted to the package, indicating the presence of narcotics. On July 24, 1991, Inspector Loftus obtained a search warrant to inspect the contents of the Express Mail package. The contents field tested positive for methamphetamine. Subsequent laboratory tests disclosed that the substance was 27.59 grams of 80% pure cocaine.

The package was returned to the mail stream to be delivered to Dr. Ford. Postal Inspectors and the South Hadley police department then placed the post office and Dr. Ford's home under surveillance. In the meantime, Dr. Ford arrived, picked up the package and then returned home. After he entered his house with the package, Sergeant David Strychars and Postal Inspector Fred Gray, who were surveilling the premises, knocked on Dr. Ford's door announcing that they were from the water department and convinced Dr. Ford to exit his home.[1] As the district court found, "[o]nce defendant exited the premises, assisted by Strychars' hand on his shoulder, the law enforcement officers informed him that he was under arrest and handcuffed him." Aplt.'s App. at 16.

---

* Of the District of Rhode Island, sitting by designation.

1. Dr. Ford contends that Sergeant Strychars and Inspector Gray immediately announced themselves as police officers. This discrepancy is immaterial for the purposes of this appeal.

The testimony of law enforcement officers and of the defendant diverge significantly as to what happened next. According to the law enforcement officers, who testified consistently with one another, Ford was first given his *Miranda* rights. Loftus then asked Ford whether Ford would give consent to a search of his house, informing Ford that the search would take place in any case after the officers obtained a warrant. Ford refused permission to search the premises.

*Id.* at 17 (citations omitted). Subsequently, Inspector Loftus explained to Dr. Ford that he would be brought to Springfield to be arraigned before a federal Magistrate Judge ("Magistrate") and that bail would be set. Dr. Ford then made several inquiries: he inquired about his dog (who was in the house); asked if he could change his clothes; whether he needed to bring money with him; and if he could go inside and use the bathroom. Dr. Ford was told that he could exchange his clothes and use the bathroom but that he could not go back in the house by himself. Inspector Loftus told Dr. Ford that the officers "would have to satisfy themselves that there was no one else on the premises who might pose a threat to them." Aplt.'s App. at 18.

Dr. Ford, Inspector Loftus and three other law enforcement personnel then proceeded to enter the house with the defendant, who posed no objection. Beginning with the ground floor, the officers performed a sweep of each floor to ensure that no one else was present. On the second floor, the officers noticed the package Dr. Ford had received that day. "On an unmade bed in a bedroom on the middle level of Dr. Ford's three level home, the agents found the package of cocaine, which had been opened, a plate with a sifter and knife and a Penthouse magazine." Aplt.'s Br. at 5–6. The group proceeded to the third level so that Dr. Ford could change his clothes.[2] When the agents reached the top floor, several doors were closed. Inspector Loftus told Dr. Ford that the agents were going to open the doors to make sure that no one else was present. Dr. Ford then responded "I wish you wouldn't." Tr., vol.

III at 55. The agents opened the doors and were able to see marijuana growing in two of the rooms. Dr. Ford asked how much money he should bring for bail and indicated he had substantial amounts of cash on hand. Inspector Loftus inquired as to the amount and Dr. Ford produced $13,000 from a wicker basket. The agents confiscated the cash.

Dr. Ford contends that it was the agents, not himself, who initiated the re-entry into the house; that the conversations concerning bail, his dog and changing clothes took place inside the house and that Inspector Loftus prompted the discussion about the money. "Loftus . . . stated that if Ford showed him where the money was immediately, Loftus would count the money in front of Ford and give him a receipt for the full amount. The implication, according to Ford, was that the money would not be accounted for properly if he did not turn it over before he was taken to Springfield." Aplt.'s App. at 21. We note that the district court, when confronted with contradictory versions of the relevant facts, accepted the version set forth by the government witnesses. "[T]he Court either rejects defendant's conflicting account of the events for lack of credibility, or else concludes, in specific instances, that certain discrepancies are immaterial for purposes of defendant's suppression motions." Aplt.'s App. at 21.

Dr. Ford was brought to the Magistrate in Springfield and Inspector Loftus obtained a search warrant for the house. When the search warrant was executed the agents seized the marijuana plants, packaged marijuana, a scale, a pistol, items used to cultivate marijuana and several postal receipts for Express Mail packages from Dr. Ford to his contact in Arizona.

## II.

Prior to trial, Dr. Ford filed a motion to suppress the evidence uncovered during the search of his house: the marijuana plants, packaged marijuana, a scale, a pistol and various items used to grow and care for the marijuana. He contends that the search was unlawful. The government argued below that the search was a lawful "protective

2. When Dr. Ford was arrested, he was wearing a tee shirt and shorts, and was barefoot.

sweep" of the house. After a hearing on the motion, the district court did not decide whether the search was a lawful protective sweep. Instead, the court determined that the evidence was admissible under an exception to the warrant requirement known as the "inevitable discovery" rule.

Because the agents in the first instance entered Dr. Ford's home without a warrant, we must determine whether the evidence seized must be suppressed or whether the evidence is admissible under an exception to the warrant requirement. We feel compelled to note that had the agents obtained a warrant, this exercise would be unnecessary. As this is not the case, we must turn to the task at hand.

■ The inevitable discovery rule, adopted by the Supreme Court in *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), provides for the admissibility of evidence discovered during a warrantless search if the evidence would have been inevitably discovered through independent legal means. "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then ... the evidence should be received." *Id.* at 444, 104 S.Ct. at 2509. The prosecution may not rely on speculation but rather must meet this burden of proof based on "demonstrated historical facts capable of ready verification or impeachment." *Id.* at 444 n. 5, 104 S.Ct. at 2509 n. 5.

In *United States v. Silvestri*, 787 F.2d 736 (1st Cir.1986), *cert. denied*, 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1988), this court established the analytical framework for the inevitable discovery rule. In *Silvestri*, police officers unlawfully searched a residence and discovered large quantities of drugs in the garage. Two other officers, who were not involved in the unlawful search, prepared the search warrant affidavit and application without any knowledge of the illegal search. Upon issuance of the warrant, the premises were lawfully searched and the evidence seized. The defendant moved to suppress the evidence. The district court denied the motion, holding the evidence to be admissible under the inevitable discovery rule. On appeal, this court affirmed the district court after considering three questions. "[A]re the legal means truly independent; are both the use of the legal means and the discovery by that means truly inevitable; and does the application of the inevitable discovery exception either provide an incentive for police misconduct or significantly weaken fourth amendment protection?" *Id.* at 744.

In *Silvestri*, the defendant argued that, in order to be truly independent, the legal means (i.e. the search warrant) must be underway at the time of the discovery; in other words, the warrant process must be ongoing at the time of the alleged police misconduct or illegal search. The defendant cited for support a Fifth Circuit decision which held that "the legal process of discovery be ongoing at the time of . the illegal discovery in order for the inevitable discovery exception to be applicable." *Id.* at 742 (discussing *United States v. Cherry*, 759 F.2d 1196 (5th Cir.1985)). *See also United States v. Satterfield*, 743 F.2d 827 (11th Cir.1984), *cert. denied*, 471 U.S. 1117, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985) (adopting similar rule); *United States v. Romero*, 692 F.2d 699 (10th Cir.1982) (same). This court declined to adopt such a strict approach.

> Rather than setting up an inflexible [sic] "ongoing" test such as the Fifth Circuit's, we suggest that the analysis focus on the questions of independence and inevitability and remain flexible enough to handle the many different fact patterns which will be presented.... In cases where a warrant is obtained, however, the active pursuit requirement is too rigid. On the other hand, a requirement that probable cause be present prior to the illegal search ensures both independence and inevitability for the prewarrant search situation.

*Id.* at 746. Under this flexible standard, *independence and inevitability remain the cornerstones of the analysis.* The specific facts of each case will determine the requirements necessary to prove independence and inevitability.

The district court applied the teachings of *Nix* and *Silvestri* and held that the inevitable discovery rule applied.

[T]he search warrant, the legal means of search, even if filtered of any reference to marijuana and the large sums of money, was wholly independent of the arguably improper protective sweep, and the discovery of the physical evidence at issue was certainly inevitable. In addition, the Court concludes that application of the inevitable discovery doctrine to the facts of this case would not significantly dilute constitutional protections or provide a carrot for police misconduct.

Aplt.'s App. at 30.

## A. The Decision To Seek A Warrant

Dr. Ford attacks the district court's holdings under each of the three *Silvestri* questions. First, he argues that the search warrant was not sufficiently independent of the warrantless entry into his home. He argues that while *Silvestri* held that the warrant process did not have to be ongoing, "it is implicit that *Silvestri* establishes as at least a minimum requirement, the *decision* to seek a warrant [must] be made prior to the time that the illegal search took place and that the decision in no way be influenced or accelerated by information gained from the illegal search." Aplt.'s Br. at 10.[3]

■ Before we address Dr. Ford's arguments, we must bear in mind the appropriate standard of review. "The standard of review of an appeal from a denial of a motion to suppress is that the decision will be upheld if any reasonable view of the evidence supports the trial court's decision." *United States v. McLaughlin*, 957 F.2d 12, 16 (1st Cir.1992). We review *de novo* any questions of law which arise in the course of our analysis. *United States v. Yoffe*, 775 F.2d 447, 451 (1st Cir.1985).

We have carefully reviewed *Silvestri* and find no language to support Dr. Ford's argument. Indeed, *Silvestri* rejected a bright line rule in favor of a flexible analysis.

[In] [t]he situation where a warrant is obtained after a warrantless search ... the requirement of active pursuit could be viewed as ensuring the independent inevitability of the police decision to seek the search warrant, i.e., to ensure that the evidence turned up in the illegal search did not influence this decision. As a protection of the independence of the warrant, however, this bright-line rule goes too far. *Silvestri*, 787 F.2d at 745. However, *Silvestri* did require "that probable cause be present prior to the illegal search [to ensure] both independence and inevitability for the prewarrant search situation." *Id.* at 746.

■ The existence of independent probable cause to search Dr. Ford's home is undisputed. Dr. Ford concedes that "it is beyond argument that the agents had probable cause to search Dr. Ford's residence after he returned with the package from the Post Office." Aplt.'s Br. at 10. It is also beyond dispute that the seized evidence would have been (and was) discovered following the authorized search. It is inevitable that the existence of probable cause would find fruition in the issuance of a search warrant. This is bolstered by the fact that there is evidence in the record, relied upon by the district court, that a decision to seek a warrant had been made prior to the warrantless entry. "Loftus then asked Ford whether Ford would consent to a search of his house, informing Ford that the search would take place in any case after the officers obtained a warrant." Aplt.'s App. at 17. Thus, we believe that a reasonable view of the evidence supports the district court's finding that the probable cause supporting the search warrant was independent of the warrantless search and that the evidence seized would have been discovered upon the issuance of a warrant.

## B. The Inclusion of Tainted Information

Dr. Ford argues that the search warrant cannot be considered independent because the search warrant affidavit included observations made during the warrantless search of the home. "The inclusion of tainted evidence in the affidavit in support of the application for a search warrant seriously undercuts the true independence of the warrant as a valid subsequent legal means." Aplt.'s Br.

**3.** The government does not dispute Dr. Ford's reading of *Silvestri* but rather argues that there is sufficient evidence showing a decision was made prior to the search.

at 16. According to Dr. Ford, because the warrant contained such tainted information, it is impossible to know with any certainty whether the magistrate would have issued the warrant in the absence of the tainted information. This uncertainty, Dr. Ford contends, renders the search warrant suspect and mandates against the application of the inevitable discovery rule.

For support, Dr. Ford cites *Murray v. United States,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). In *Murray,* the Supreme Court considered the "independence" of legal means under another exception to the warrant requirement—the independent source doctrine.

> The ultimate question, therefore, is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here. This would not have been the case ... if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.

*Id.* at 542, 108 S.Ct. at 2536. Contrary to Dr. Ford's contention, the Court did leave some room for speculation when making this determination. "To determine whether the warrant was independent of the illegal entry, one must ask whether it would have been sought even if what actually happened had not occurred." *Id.* at 542 n. 3, 108 S.Ct. at 2536 n. 3. Dr. Ford also cites *Nix* for the proposition that speculation may not play any role in a determination under the inevitable discovery rule. "[I]nevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings." *Nix,* 467 U.S. at 444 n. 5, 104 S.Ct. at 2509 n. 5.

When reviewing affidavits containing "tainted" evidence, courts regularly set aside the tainted information and then determine if "there remains sufficient content in the warrant affidavit to support a finding of probable cause." *Franks v. Delaware,* 438 U.S. 154, 172, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978). This court has applied the same

analysis. "[The illegally obtained information] should be set to one side (as the district court did) and the remaining content of the affidavit examined to determine whether there was probable cause to search, apart from the tainted averments." *United States v. Veillette,* 778 F.2d 899, 904 (1st Cir.1985), *cert. denied,* 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986).

■ Here, the district court performed precisely this analysis.

> [A] valid warrant to search Ford's home would have issued despite the information obtained in the course of the protective sweep.... If one were to strike from the supporting affidavit any and all references other than those to the express mail package in question and the events leading to its arrival in defendant's dwelling, the search warrant would have issued based on probable cause.

Aplt.'s App. at 29. This finding cannot be seriously doubted. We set forth a portion of the affidavit to underscore this holding.

> 2. This morning I received a search warrant for an Express Mail package suspected of containing controlled substances....
>
> 3. The Express Mail package was addressed to Dr. Jeff Ford, 90 Amherst Road, So. Hadley, MA 01075.
>
> 4. Upon executing the search warrant I found approximately 30 grams of a substance that field tested positive for methamphetamine, a Schedule III controlled substance.
>
> .    .    .    .    .
>
> 6. At approximately 2:15 p.m. Ford picked up the Express Mail package and drove to his home at 90 Amherst Road, South Hadley, Massachusetts (the "Premises").
>
> 7. At approximately 2:45 p.m. Ford was arrested by another U.S. Postal Inspector at the Premises.

Rec., doc. 29, ex. B at 1. It requires no speculation to determine that the excised affidavit supports a finding of probable cause.[4] We therefore reject Dr. Ford's sec-

---

**4.** Dr. Ford argues that *Franks* and *Veillette* are inapplicable in an inevitable discovery context.

ond attack on the independence of the warrant.[5]

## C.  Incentive for Police Misconduct

Finally, Dr. Ford argues that application of the inevitable discovery rule in this case would weaken Fourth Amendment protection and provide an incentive for police misconduct. He points out that the agents did not attempt to secure either a search or an arrest warrant prior to Dr. Ford's receipt of the package. Further, because the agents used a ruse (the water department story) to lure Dr. Ford from his home, "it was surely not a surprise for the defendant to have needs related to the inside of the home." Aplt.'s Br. at 26. "The government should not be permitted to be indifferent to the warrant requirement for twenty-four hours and rely on a search warrant obtained after agents have engaged in an entirely predictable and manufactured 'protective sweep,' as proof of inevitability." *Id.* at 27.

Although we agree with Dr. Ford that a warrant would have avoided this problem, we cannot agree that applying the inevitable discovery doctrine in this situation would provide an incentive for misconduct. We have found only one case in which a court, after engaging in the *Silvestri* analysis, refused to apply the inevitable discovery rule due to the incentive for police misconduct. *United States v. Rullo,* 748 F.Supp. 36 (D.Mass.1990). In *Rullo,* the police used excessive physical force to compel a suspect to disclose the location of a gun. The court held that, although the gun would have been inevitability discovered through a separate

search, the incentive for police misconduct was so great that the inevitable discovery rule could not apply. The present case obviously does not involve such blatant police misconduct.

In fact, as the district court stated, "it is dubious whether the police involved in this case behaved improperly at all." Aplt.'s App. at 30. A police officer has the right to remain with a suspect at all times. *Washington v. Chrisman,* 455 U.S. 1, 6–7, 102 S.Ct. 812, 816–817, 70 L.Ed.2d 778 (1982). In *Chrisman,* a student was detained outside of his dormitory. The student requested that he be allowed to return to his room to obtain identification. He was told that the police officer would accompany him if he should return to his room. The student consented. While standing in the doorway of the room, the police officer saw, in plain view, marijuana seeds and a pipe. The Court held that the police officer "properly accompanied [the student] to his room, and that his presence in the room was lawful." *Id.* at 7, 102 S.Ct. at 817. *See also United States v. Hidalgo,* 747 F.Supp. 818 (D.Mass.1990) (holding that there was no incentive for police misconduct when the search of the premises took place out of a concern for the safety of the police officers involved).

In light of these decisions, we do not believe that applying the inevitable discovery doctrine in the present case provides an incentive for police misconduct. The police had the right to accompany Dr. Ford when he reentered the house. Further, the district court found that the protective sweep was motivated by a concern of the police

*Veillette* was decided under the independent source doctrine which, according to Dr. Ford, lacks the requirement of inevitability. We note once again that the *Silvestri* analysis is a flexible one, turning on the particular facts of each case. In closer cases, the requirement of inevitability may mandate that the Magistrate not be presented with any of the tainted information. However, in such a clear case as this, we do not believe that the inevitability of the issuance of the warrant can be seriously questioned.

**5.**  Dr. Ford also argues that the warrant should not be considered independent because the agents who were involved in the warrantless search were also the agents who prepared the search warrant. Many courts have considered the level of participation by agents not involved

in the original search. *See Silvestri,* 787 F.2d at 741–742; *United States v. Merriweather,* 777 F.2d 503 (9th Cir.1985), *cert. denied* 475 U.S. 1098, 106 S.Ct. 1497, 89 L.Ed.2d 898 (1986); *United States v. Hidalgo,* 747 F.Supp. 818, 833 (D.Mass. 1990); *Hunnewell v. United States,* 738 F.Supp. 582, 584 (D.Maine), *aff'd without opinion,* 923 F.2d 839 (1st Cir.1990). These cases demonstrate that the level of participation is *one* of the many factors to be considered when determining the independence of the warrant. As we have previously stated, the independence of the warrant in the present case is firmly established. The overlap between the agents searching the premises prior to the warrant and the agents preparing the warrant does not alter our holding.

officers to protect themselves. Aplt.'s App. at 18–19. We therefore hold that a reasonable view of the evidence supports the district court's application of the inevitable discovery rule. The denial of the motion to suppress is AFFIRMED.

### III.

Among the items discovered during the search of Dr. Ford's house was a book entitled *Secrets of Methamphetamine Manufacture.* Prior to trial, Dr. Ford filed a motion in limine requesting the court to exclude the book from evidence. The motion was denied after a brief sidebar conference. The government offered the book into evidence. Dr. Ford renewed his objections, arguing that the book was irrelevant and prejudicial.

Rule 401 of the Federal Rules of Evidence defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than would be without the evidence." Fed.R.Evid. 401. Dr. Ford contends that the book does not meet the this definition. "The title of the book makes this perfectly clear. This trial had nothing whatsoever to do with methamphetamine, let alone its manufacture." Aplt.'s Br. at 30. Further, Dr. Ford argues that any inferences which could be drawn from the book would be solely related to the manufacture of methamphetamine and "would still have no tendency to prove that Dr. Ford had an intent to distribute the cocaine and marijuana found in his possession, which was the sole contested issue at trial." *Id.*

■ We review evidentiary decisions under the abuse of discretion standard. *United States v. Nason,* 9 F.3d 155, 162 (1st Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1331, 127 L.Ed.2d 678 (1994). "The threshold for relevance is very low under [Rule 401]." *Id.* The district court found that the book was a tool of the drug trafficking trade and therefore should be admitted into evidence. Tr., vol. III at 5. We cannot say that the district court abused its discretion in admitting the book. As aptly stated by the government, the book "describes how to create a sophisticated illicit drug opera-

tion.... Viewed in conjunction with the *High Times Magazine* which Ford testified he read to develop his sophisticated marijuana growing operation, this evidence tended to show that Ford was a drug dealer as opposed to someone who merely possessed drugs for his personal use." Aplee.'s Br. at 28. Such evidence meets the "any tendency" test. We will not disturb the Rule 401 ruling of the district court.

■ After having determined that the book is relevant, we must now consider whether the admission of the book is overly prejudicial under Rule 403. Rule 403 states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ..." Fed.R.Evid. 403. Dr. Ford contends that the book is overly prejudicial.

> Since the book had nothing to do with cocaine, marijuana or their distribution, it surely caused the jury to speculate about why it was an exhibit in the case. The risk ... is that the jury would infer without other evidence that possession of the book indicated an interest in manufacturing drugs in general and that the defendant's possession of cocaine and marijuana in question were somehow part of this broader plan.

Aplt.'s Br. at 31. Dr. Ford argues that the evidence presented a close case and that the book, "which suggested a larger and more sinister involvement with narcotics than was warranted by the evidence" tipped the scales against the defendant. *Id.* at 33.

The government notes that after the book was admitted into evidence, "it was never mentioned again by a witness or the government as significant to the main issue in the case." Aplee.'s Br. at 31. Indeed, the government did not discuss the relevance of the book in its closing argument.

Rule 403 "admissions of evidence are within the sound discretion of the trial court. We will not disturb such rulings absent an abuse of discretion. We will, nevertheless, reverse a lower court's determination in 'exceptional circumstances.'" *United States v. Rodriquez–Cortes,* 949 F.2d 532, 540 (1st Cir.1991).

*See also United States v. Green,* 887 F.2d 25, 27 (1st Cir.1989); *United States v. Griffin,* 818 F.2d 97, 101–102 (1st Cir.), *cert. denied,* 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987). While Dr. Ford argues that exceptional circumstances are present in this case, he fails to articulate what those circumstances are beyond the notion that the admission of the book tipped the scales. However, Rule 403 does not act to exclude any evidence which may be prejudicial but rather evidence in which the prejudice "substantially outweighs" the probative value. We cannot say that the book, a tool of the drug trafficking trade as the trial judge found, was so lacking in probative value as to be excluded under Rule 403 nor that exceptional circumstances exist which require the reversal of the district court. Thus, the district court's admission of the book entitled *Secrets of Methamphetamine Manufacture* is AFFIRMED.

## IV.

■ Dr. Ford's final issue on appeal concerns count two of the indictment alleging possession of cocaine with intent to distribute. He contends that there is insufficient evidence to support the conviction for this count. "We review the evidence in the light most favorable to the government, including all legitimate inferences to be drawn therefrom, to determine whether a rational trier of fact could have found defendant guilty beyond a reasonable doubt." *United States v. Montoya,* 917 F.2d 680, 681 (1st Cir.1990). " 'The prosecution ... need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt.' " *United States v. Almonte,* 952 F.2d 20, 24 (1st Cir.1991) (citations omitted), *cert. denied,* —— U.S. ——, 112 S.Ct. 1776, 118 L.Ed.2d 434 (1992).

The cocaine seized had a net weight of 27.59 grams, or just under one ounce. In *United States v. Latham,* 874 F.2d 852, 863 (1st Cir.1989), this court stated "that an inference of intent to distribute is not warranted from the possession of one ounce of cocaine." Dr. Ford contends that in light of *Latham,* the government must look to other evidence to prove that the cocaine was for distribution rather than for personal use. Dr. Ford's reading of *Latham* is immaterial since the government has offered other evidence of an intent to distribute.

Dr. Ford points to numerous factors which support his contention that the cocaine was for personal use.

When the agents entered Dr. Ford's home, only moments after they had observed him enter with the package of cocaine, they found that the package had been opened and placed on a bed with a plate, a grinder and a Penthouse magazine. Agent Loftus acknowledged that the grinder is an instrument used to convert cocaine that is often granular when purchased, into a fine powder more suitable for inhaling. A straw and a mirror, two other objects commonly associated with the consumption of cocaine was found. In addition, small vials designed for consumption of cocaine and containing cocaine residue were recovered in the house. Certainly the circumstances under which the cocaine was recovered, raise a strong suggestion that at least some of the cocaine was about to be consumed by Dr. Ford.

Aplt.'s Br. at 35. Dr. Ford also argues that items commonly used for narcotics distribution were absent from his home. For example, the search did not uncover any substance used to dilute cocaine, small plastic bags, vials or three to four inch squares of magazine paper. Further, no ledgers, receipts or notebooks indicating narcotics transactions were recovered. Dr. Ford argues that there are only three items found in his home which arguably intimate an intent to distribute: the gun, the scale and the $13,000 in cash. The government argues that these three items, together with the weight and purity of the cocaine, provide sufficient evidence to support a conviction.[6]

---

6. Sergeant Kerle testified that an ounce of 80 percent pure cocaine could have been diluted and divided up into 112 grams with a street value of $11,200. Tr., vol. I at 36–37. He also testified as an expert that "this amount of cocaine in that purity is consistent with [an] intent to distribute it." *Id.* at 39.

This court has held that scales, firearms and large amounts of cash are each probative of the intent to distribute narcotics. "[W]e have long 'recognized that in drug trafficking firearms have become "tools of the trade" and thus are probative of the existence of a drug conspiracy.'" *United States v. Walters,* 904 F.2d 765, 796 (1st Cir.1990) (citing *United States v. Green,* 887 F.2d 25, 27 (1st Cir.1989)). Dr. Ford does not dispute this but rather argues that the firearm has no tendency to prove that Dr. Ford was intending to distribute the cocaine. According to Dr. Ford, the weapon was found in a bedroom closet on a different floor from which the cocaine was found. Further, Dr. Ford was not armed when he picked up the package nor when the agents approached his house.

There is other evidence in the record which supports the government's contention that the gun was used as a tool of the trade. The gun, a .357 Magnum, was kept in the closet of the bedroom where Dr. Ford slept and on the same floor as the $13,000 in cash and the marijuana. Tr., vol. III at 88. Two loaded "speed loaders" were also located in the closet. *Id.* Finally, Dr. Ford acknowledged that one of the reasons he had the gun was for "personal protection" and that due to the marijuana and cocaine in the house he could not call the police if someone sought to break into his home. Tr., vol. II at 18–19.

The government argues that the scale is further evidence of the intent to distribute cocaine. Dr. Ford conceded that he used the scale to weigh drugs. Tr., vol. IV at 116. This court has acknowledged that a scale is one of the tools of the trade for drug dealers, *Montoya,* 917 F.2d at 682, and therefore may be considered as evidence here.

Finally, the government argues that Dr. Ford could not persuasively account for the $13,000 in cash. "Evidence that the defendant possessed or controlled substantial sums of money from unexplained sources is relevant in a prosecution for drug trafficking." *United States v. Figueroa,* 976 F.2d 1446, 1454 (1st Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1346, 122 L.Ed.2d 728 (1993). *See also United States v. Newton,* 891 F.2d 944, 948 (1st Cir.1989); *United*

States v. Ariza–Ibarra, 605 F.2d 1216, 1224–25 (1st Cir.1979), *cert. denied,* 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981). Dr. Ford contends that he sufficiently explained the source of a substantial portion of the cash. Dr. Ford's sister testified that she loaned him $7500. Tr., vol. IV at 49. Dr. Ford testified that he borrowed $7500 from his sister and $7500 from his parents. *Id.* at 84. Dr. Ford also testified that he kept his assets in cash rather than a bank account because "[he] left a lot of institutions holding the bag financially. People were looking for [him.] ... So there were people that wanted money from [him.]" *Id.* at 89.

The government notes that Dr. Ford testified that he stopped making payments for his rent, his car lease and his orthodontic practice yet he had $13,000 in cash on hand. Further, "when faced with a listing of his known expenses for the months prior to his arrest, Ford was unable to reconcile those expenses with the amount of cash he had on hand." Aplee.'s Br. at 36.

Each of these three pieces of evidence must be considered in the light most favorable to the government. Although Dr. Ford may have provided reasons for the existence of the scale, the gun and the cash, the finder of fact is free to reject his explanation. It is not the province of this court to reweigh conflicting testimony or to make credibility determinations. Based on our review of the record, we hold that the government has presented sufficient evidence to support a conviction under count two.

The decision of the district court is AFFIRMED.