US v. Cheryl Burnette                    CR-99-107-B    10/10/01
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW HAMPSHIRE


**United States of America**

        v.                              Civil No. CR-99-107-B
                                        Opinion NO. 2001DNH187

**Cheryl Burnette**



                    **MEMORANDUM AND ORDER**

        Cheryl Burnette has been charged with wire fraud, see 18

U.S.C. § 1343, and impersonating an employee of the United

States, see 18 U.S.C. § 912.  She stands accused of inducing

businesses to provide her with goods and services by falsely

assuring them that she was a government employee and that the

government would pay the bills.  I have before me a number of

Burnette's pretrial motions which I address in turn.

    A. **MOTION TO SUPPRESS ITEMS SEIZED FROM BROWARD**
       **STORAGE AND TO DISMISS THE INDICTMENT**

        Burnette has moved to suppress evidence collected by Special

Agent Dennis Poltrino of the Environmental Protection Agency

(EPA) during a warrantless search of a storage facility in

Hollywood, Florida.  Burnette argues that she had a reasonable

expectation of privacy in the contents of her rented storage bin, thus requiring Poltrino to have obtained a warrant before conducting his search. Burnette seeks to suppress all evidence obtained as a direct or indirect result of the search under the "fruit of the poisonous tree" doctrine. See Wong Sun v. United States, 371 U.S. 471, 484-88 (1963). Burnette also argues that with the suppression of this evidence, her indictment is without merit and should be dismissed. I assume for purposes of analysis that Burnette had a reasonable expectation that the contents of the storage bin would remain private and that Poltrino's search did not comply with the Fourth Amendment. Nevertheless, I deny Burnette's motion because she has failed to explain how this allegedly illegal search could have tainted any of the evidence that the government intends to introduce during the trial.

## FACTS[1]

Burnette first contacted Gino Centofanti, the owner of Broward Moving Unlimited in April 1997, asking for general information and telling him that if she rented storage space the

---

[1]The facts set forth in this order are my findings based upon review of the parties' briefs, affidavits and exhibits, as well as the hearing held on these motions on August 29-30, 2001.

services would be paid for by the EPA. Centofanti established a billing account for the EPA and, on May 3, 1997, several sealed cardboard boxes arrived at Broward Moving where an employee locked them in a storage bin with a label on the outside indicating that the EPA owned them. Thereafter, Centofanti tried unsuccessfully to persuade Burnette to sign a rental agreement.

From May 1997 to April 2000, Broward Moving mailed invoices for the monthly storage fee to an address in Washington, D.C. provided by Burnette. Although Burnette never paid any of the invoices, she assured a Broward Moving employee that the bills would be paid and sought confirmation that her belongings were safe.

Agent Poltrino met with Centofanti in July 2000. Shortly thereafter, without first obtaining a warrant, Poltrino searched the storage bin and seized records and documents belonging to Burnette.

## DISCUSSION

When a defendant invokes the fruit of the poisonous tree doctrine, she must initially explain how the evidence she seeks to suppress could have become tainted by the allegedly illegal

search.  See Alderman v. United States, 394 U.S. 165, 183 (1969) ("petitioners acknowledge that they must go forward with specific evidence demonstrating taint"); United States v. Bonilla Romero, 836 F.2d 39, 45 (1st Cir. 1987); United States v. Finucan, 708 F.2d 838, 844 (1st Cir. 1983); see also United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir. 2000); United States v. Kandik, 633 F.2d 1334, 1335 (9th Cir. 1980); United States v. Crouch, 528 F.2d 625, 628, 629 (7th Cir. 1976).  The government does not become obligated to prove that the evidence in question was developed independently until the defendant satisfies its burden of production on this issue.  See Bonilla Romero, 836 F.2d at 45.

Burnette has failed to satisfy her burden of production. The government has stated that it will not seek to introduce any of the items it seized during the search of the storage bin and it asserts that it obtained its trial evidence  before Agent Poltrino searched the bin.  Burnette has failed to refute these contentions.  This failure is especially problematic here because Poltrino did not search the storage bin until long after the government had obtained its indictment and presumably had

gathered the bulk of its trial evidence.  Accordingly, Burnette

is not entitled to the relief she seeks.

**B.  MOTION TO SUPPRESS EVIDENCE OBTAINED FROM COMMERCIAL MAIL RECEIVING AGENCIES AND TO DISMISS THE INDICTMENT**

Burnette has moved to suppress evidence collected by Special

Agent Cassandra Todd of the EPA, who observed the outside of

Burnette's mail on numerous occasions without obtaining a mail

cover[2] from the United States Postal Service (USPS).[3]  Burnette

argues that any evidence gathered as a direct or indirect result

of observing her mail in the absence of a mail cover should be

---

[2]  A mail cover is a process by which the USPS makes a nonconsensual record of any data appearing on the outside of a suspect's mail.  The Chief Postal Inspector or a designee has the authority to approve written requests from law enforcement agencies in which the agency specifies reasonable grounds to demonstrate that a mail cover is necessary to obtain evidence. Once a mail cover application is approved, the USPS will record (by a transcription, photograph or photocopy) the image of the outside cover, envelope, wrapper or contents of the subject's mail and transmit reports directly to the requesting law enforcement agency.  Mail covers continue for 30 days and are address-specific.  Once the USPS has recorded the image on the outside of the subject's mail, it is delivered to the subject at the address.  Mail covers are governed by 39 U.S.C. § 404 and 39 C.F.R. § 233.3.

[3]  Burnette also asserts that government agents illegally opened and reviewed her mail.  I reject this assertion, however, because I am convinced after conducting an evidentiary hearing that it is untrue.

suppressed. For the reasons that follow, I reject Burnette's argument.

## FACTS

Over the past several years, Burnette has rented mailboxes at various commercial mail receiving agencies (CMRAs). During the course of its investigation, Agent Todd and other EPA agents inspected the outside of Burnette's incoming mail at several of these CMRAs. On three other occasions, Agent Todd applied for mail covers so that the USPS could inspect Burnette's mail. Twice the USPS granted her applications. The USPS returned a third application for more information. Burnette seeks to suppress all evidence derived from inspections of her mail at the CMRAs.

## DISCUSSION

To invoke the Fourth Amendment's protection against unreasonable searches and seizures, a person must have a reasonable expectation that the government cannot search the place or seize the item or information in question without a warrant. See Minnesota v. Carter, 525 U.S. 83, 88 (1998) (citing Rakas v. Illinois, 439 U.S. 128, 143 (1978)). Courts have

established that a person has no reasonable expectation of privacy in the information conveyed on the outside of her mail. See United States v. Choate, 576 F.2d 165, 177 (9th Cir. 1978); United States v. Clark, 695 F. Supp. 1257, 1262 (D. Me. 1988). Instead, "a person may reasonably expect privacy only with respect to the contents of an envelope and not with respect to information knowingly exposed to third parties on the envelope's exterior."  Reporter's Comm. for Freedom of the Press v. A.T.&T., 593 F.2d 1030, 1057 (D.C. Cir. 1978) (emphasis in original). Where a person lacks an expectation of privacy, the Fourth Amendment remains inapplicable and suppression of evidence is unnecessary.

Burnette does not base her motion on the Fourth Amendment. Instead, she argues that the USPS regulations governing mail covers make it illegal for law enforcement agents to inspect the outside of a suspect's mail at a CMRA.  She further contends that the EPA's investigating agents knowingly and willfully violated these regulations.

I need not decide whether Burnette's argument has merit in order to dispose of her motion to suppress.  The mere violation of agency regulations, without more, does not justify the

exclusion of otherwise relevant evidence unless the regulations specifically prescribe suppression as a permissible remedy. See United States v. Edgar, 82 F.3d 499, 510-11 (1st Cir. 1996). The USPS mail cover regulations do not permit this remedy. See 39 C.F.R. § 233.3. For this reason, I deny Burnette's motion.

### C. MOTION TO SUPPRESS ITEMS SEIZED FROM THE QUECHEE RESIDENCE AND TO DISMISS THE INDICTMENT

Burnette has moved to suppress evidence collected by Agent Poltrino during three searches of her residence in Quechee, Vermont. Burnette argues that the first two searches were unlawful because Poltrino failed to obtain a warrant to conduct either search. She argues that the third search, which was conducted pursuant to a warrant, was unlawful because Agent Poltrino used information obtained during the first two illegal searches to obtain the warrant. Burnette also asks this Court to suppress a Rolex watch that Poltrino seized from her during her arrest. Finally, Burnette contends that the police illegally searched two of her bags at the police station after her arrest. I reject Burnette's arguments.

### FACTS

On the morning of September 27, 1999, Agent Poltrino and his

partner, Agent Melissa Blair, knocked on the door of defendant's residence at 25 Alden Partridge Road in Quechee, Vermont. When Burnette asked who was there, Poltrino identified himself and explained that he had a warrant for her arrest. For close to an hour, Burnette refused to open the door and submit to arrest. During this time, Blair called the local police for assistance, and Poltrino obtained instructions from the U.S. Attorney's Office to forcibly enter the house in order to arrest Burnette.[4]

Agent Poltrino then kicked in the front door of the house, found Burnette near the front of the house, and placed her under arrest. He demanded several times to know whether anyone else was present in the house, but Burnette refused to answer. Shortly thereafter, Poltrino and one of the local law enforcement officers noticed a man emerge from a bedroom. The officers handcuffed the man and later identified him as Michael Tamulis. Fearful that more people could be in the house, Poltrino and a local police officer, Alan Patterson, performed a protective sweep, checking all places in the house where a person could be

---

[4] To the extent that Burnette's averments are in conflict with Agent Poltrino's testimony concerning the events that immediately preceded her arrest, I credit Poltrino's testimony.

hiding.

During the course of the protective sweep, Agent Poltrino observed several items in plain view that he believed were connected to the crimes for which Burnette has now been indicted. He observed two mountain bikes sitting in the foyer to the right of the door through which he had entered the house. He saw a laptop computer, a cell phone, and a box for a Nokia cell phone on the dining room table. He next entered a family room where he observed a fax machine in the area to the left of the room's fireplace, some exercise bikes, a briefcase, and an answering machine. In the living room, he saw cases of environmental law books. Moving to the master bedroom, he noted an AT&T fax telephone, some Harvard University boxes, and on the bed, a telephone directory for the Department of Justice. Finally, he observed another mountain bike in one spare bedroom and a Canon printer box in another spare bedroom.

After performing the protective sweep, Agent Poltrino confiscated Rolex watches worn by Burnette and Tamulis because he had received information from a jewelry store owner that Burnette had illegally obtained both watches. As the agents and officers prepared to bring Burnette and Tamulis to the police station for

booking, Burnette pointed to a black briefcase and a black leather bag and asked to bring both items with her to the station.[5]  She was permitted to do so.

Agent Poltrino remained at the house after Burnette and Tamulis were taken to the station in order to secure the residence until the front door could be repaired.  While waiting, he decided to walk through the house again to obtain more detailed information about several items he had noticed during his protective sweep.  These included mountain bikes, a laptop computer, a cell phone, and a fax machine.  Poltrino conducted this second search because he believed that the application he planned to make for a search warrant would be better supported by listing the brand names and serial numbers of these objects.

The next day, Agent Poltrino submitted an application for a search warrant to the U.S. District Court for the District of Vermont.  In his warrant application, Poltrino detailed much of the information he had obtained during his investigation,

---

[5]  Burnette claims that she did not ask to take the briefcase and bag to the police station.  After holding an evidentiary hearing on this issue, I find her assertion unpersuasive.  Instead, I credit Agent Poltrino's testimony that Burnette asked to have both bags brought to the station.

-11-

including information obtained from both the protective sweep and the second search of Burnette's residence. He stated that he had observed the following items in plain view: An IBM Thinkpad Laptop computer; several computer boxes; a facsimile machine; a Canon Multi-Press C300 printer; an HP Laser Jet Power Printer; boxes from Harvard University; Nokia Cellphone boxes; and two bicycles. Affidavit Supporting Warrant Application at ¶ 7(c). Agent Poltrino also attached as "Appendix A" to his affidavit a list of items that Burnette allegedly had obtained through fraudulent means. Of the brand names he identified in his affidavit, the only one to appear also in Appendix A is the IBM Thinkpad laptop computer.

The U.S. District Court in Vermont approved the warrant application. In carrying out the search, Agent Poltrino seized items that the government proposes to use during its case against Burnette.

**DISCUSSION**

**1. The Protective Sweep**

Burnette does not dispute that Agents Poltrino and Blair, along with local law enforcement officials, lawfully entered her

residence on September 27. That being the case, Poltrino and Officer Patterson were justified in performing a protective sweep of the residence because they had a reasonable basis to be concerned that other people might be in the residence who could threaten their safety. See Maryland v. Buie, 494 U.S. 325, 334-36 (1990). A protective sweep is "a quick and limited search of [the] premises, incident to an arrest and conducted to protect the safety of police officers or others." Id. at 327; Crooker v. Metallo, 5 F.3d 583, 584 (1st Cir. 1993). It is justified if the arresting officers have a reasonable suspicion, based on articulable facts, that another person who poses a danger to the officers or others might be on the premises. Buie, 494 U.S. at 334; Crooker, 5 F.3d at 584.

Agent Poltrino was justified in conducting a protective sweep in this case because he had specific reasons to fear that other people might be in the home who could threaten his safety.[6] Because Burnette refused to respond to his reasonable demands to

_____

[6] I note that the record contains no evidence to suggest that the protective sweep was pretextual or that it was more extensive than was reasonably necessary to determine whether others were present in the home.

-13-

know whether any other people were in the house, Poltrino had reason to fear that others might be present. The appearance of Tamulis served only to confirm these fears. Given the uncertainty and the real risk that law enforcement officers face when they are required to forcibly enter an uncooperative suspect's home to effect an arrest, it is not unreasonable for such officials to conduct a protective sweep of the home if the suspect refuses to tell the officials whether others are present. Accordingly, Poltrino's first search of the premises was lawful.

## 2. Rolex Watch

Law enforcement officials may lawfully "search the person of the accused when legally arrested to discover and seize the fruits or evidence of crime." Weeks v. United States, 232 U.S. 383, 392 (1914); see also Harris v. United States, 331 U.S. 145, 154 (1947). The ability of the police to seize lawfully "fruits or evidence" of crime specifically includes stolen property. See Harris, 331 U.S. at 154. There is no dispute that Poltrino's arrest of Burnette was lawful and that he had a right to search her incident to that arrest. When Poltrino seized the Rolex watch worn by Burnette, he had probable cause to believe, based

upon information he had received from the person who supplied Burnette with the watch, that she had obtained the watch illegally. Thus, his seizure was lawful and the watch will not be suppressed.

### 3. Inventory Search of Bags

The Supreme Court has considered the reasonableness of searching personal items found on or with a person lawfully arrested once they arrive at the police station. The Court has stated that these inventory searches are "entirely proper" and that police may reasonably search "any container or article" in the possession of a person lawfully arrested as part of the administrative procedure that accompanies booking and jailing. Illinois v. Lafayette, 462 U.S. 640, 646, 648 (1983); see also United States v. Doe, 878 F.2d 1546, 1553 (1st Cir. 1989).

Burnette argues that law enforcement officers took her two black bags to the police station against her will. I reject Burnette's contention and instead credit Agent Poltrino's testimony that she asked the police to bring the bags to the police station. Accordingly, the inventory search of the bags that followed was lawful.

## 4. The Second Search

While Agent Poltrino's protective sweep of Burnette's residence was lawful, the government concedes that his second search hours later, after Burnette had been taken into custody, was not. Burnette argues that Poltrino's third search of the premises was impermissibly tainted by his illegal second search. I disagree.

Both a plurality of the United States Supreme Court and the First Circuit Court of Appeals have recognized that evidence seized pursuant to a lawful search warrant should not be suppressed because of an earlier illegal search if the lawful search was independent of the first search. See Murray v. United States, 487 U.S. 533, 535-39 (1988); United States v. Silvestri, 787 F.2d 736, 739 (1st Cir. 1986). This exception to the exclusionary rule is commonly known as the "inevitable discovery" doctrine. See id. To successfully invoke this doctrine, the government must establish that: (1) the lawful second search was independent of the first search; (2) the second search was inevitable; and (3) applying the doctrine will neither provide incentives for police misconduct nor otherwise significantly

-16-

weaken Fourth Amendment protections. <u>Silvestri</u> 787 F.2d at 744.

The First Circuit invoked the inevitable discovery doctrine in <u>United States v. Ford</u>, 22 F.3d 374 (1st Cir. 1994) to uphold a district court's denial of a suppression motion on facts that are remarkably similar to the facts of this case. There, postal inspectors conducted a warrantless protective sweep of the defendant's residence and later included information they developed during the first search in an affidavit they used to obtain a warrant to search the residence a second time. <u>See</u> <u>id.</u> at 376-77.

The Court of Appeals determined that the second search was independent of the first search because the police did not require any of the information they obtained during the first search to establish probable cause to conduct the second search. <u>See</u> <u>id.</u> at 378. The court also concluded that the second search was inevitable because the inspectors told the defendant before they conducted the first search that they were planning to obtain a warrant to search the premises. <u>See</u> <u>id.</u> Finally, the court rejected the defendant's argument that applying the inevitable discovery doctrine would permit law enforcement officers "to be

indifferent to the warrant requirement for twenty-four hours and rely on a search warrant obtained after agents have engaged in an entirely predictable and manufactured protective sweep as proof of inevitability." Id. at 380 (citation and internal quotations omitted).

The present case is indistinguishable from Ford. First, Agent Poltrino had ample independent and untainted probable cause to support his application for the warrant to conduct the third search. As his search warrant affidavit reveals, Poltrino had spoken with numerous people who claimed to have been victims of Burnette's wire fraud schemes before he ever entered her residence. He knew that Burnette's alleged victims claimed that Burnette had used fraudulent means to induce them to provide her with goods such as a bicycle, two Rolex watches, and various pieces of computer equipment. After Poltrino arrested Burnette, he also discovered that she and her companion were wearing the fraudulently obtained Rolex watches. Finally, while conducting the protective sweep, Poltrino observed a bicycle, a laptop computer, various computer boxes and several other pieces of computer equipment that were consistent with other items that

Burnette allegedly had obtained through fraudulent means. The only additional information that Poltrino obtained as a result of the illegal second search concerned the brand names of certain items that he had observed during the protective sweep. This additional information could not have affected the issuing judge's probable cause determination.

Second, Agent Poltrino inevitably would have obtained the warrant to conduct the third search even if he had not conducted the illegal second search. Poltrino testified at the suppression hearing that he performed the second search in order to obtain more specific information to include in his application for a warrant to conduct the third search. This testimony demonstrates that he was planning to obtain a warrant before he conducted the second search. Thus, the third search was truly inevitable.

Finally, I reject any suggestion that I will encourage police misconduct or otherwise undermine the Fourth Amendment if I apply the inevitable discovery doctrine in this case. Agent Poltrino had ample probable cause to search Burnette's residence even before he entered her home. He also had a plan to obtain a warrant to search the premises which predated the second search.

Moreover, it is obvious that any competent law enforcement official in Poltrino's position would have sought and obtained a warrant to search Burnette's home even if he had been able to arrest her without ever entering the residence.  Refusing to suppress evidence based upon an illegal search that was unnecessary and produced nothing of value to the police will not encourage future misconduct or otherwise undermine the Fourth Amendment.  Accordingly, I reject Burnette's argument that the evidence obtained during the searches of her residence should be suppressed.

**D. MOTION TO DISMISS THE INDICTMENT FOR PROSECUTORIAL MISCONDUCT IN THE GRAND JURY**

Burnette has moved to dismiss the indictment, citing instances of prosecutorial misconduct before the grand jury. Specifically, she alleges that dismissal is required because the prosecutor (i) impermissibly relied upon hearsay, (ii) "inflamed" the grand jury by mentioning narcotics and telling the jurors that Burnette was currently in prison, and (iii) lied about the evidence against her.  Burnette's motion is without merit. First, hearsay testimony is permitted in grand jury proceedings, see United States v. Ortiz de Jesus, 230 F.3d 1, 4 (1st Cir.

2000).  Second, the prosecutor mentioned narcotics in the context of explaining the federal sentencing guidelines and it is not apparent how the grand jury would be inflamed by that.  Moreover, the prosecutor noted only briefly that Burnette was in jail when he was giving the jurors her basic biographical information.  Finally, whether the charges against Burnette are supported by credible evidence is a question of fact to be decided by the jury at her trial.  See Estate of Spinosa v. Int'l Harvester Co., 621 F.2d 1154, 1160 (1st Cir. 1980).  Defendant's motion is denied.

**E.  MOTION TO DISMISS THE INDICTMENT BASED UPON OUTRAGEOUS GOVERNMENT CONDUCT**

Burnette has moved to dismiss her indictment based upon outrageous government conduct.  In support of this motion, Burnette offers no examples of the government's behavior other than the evidence she offered in support of her motions to suppress.  To the extent that Burnette bases her arguments on averments of fact that are inconsistent with the facts testified to by the government during the suppression hearing, I am persuaded by the government's evidence.  Moreover, I reject any suggestion that any of the government's agents acted in bad faith or that their conduct rises to the level of outrageous government

misconduct.  Burnette's motion is denied.

**CONCLUSION**

The following motions made by Burnette are denied:  Motion to Suppress Items Seized from Broward Storage and To Dismiss the Indictment (Doc. No. 80); Motion to Suppress Items Seized From Ms. Burnette's Quechee Residence and To Dismiss the Indictment (Doc. No. 96); Motion to Dismiss Indictment for Prosecutorial Misconduct in the Grand Jury (Doc. No. 98); Motion to Dismiss the Indictment Based Upon Outrageous Government Conduct (Doc. No. 97); and Motion to Suppress Evidence Obtained From Commercial Mail Receiving Agencies and To Dismiss the Indictment (Doc. No. 84).

SO ORDERED.


_____
Paul Barbadoro
Chief Judge

October 10, 2001

cc:   Robert M. Kinsella, AUSA
      Harry C. Batchelder, Jr., Esq.