UNITED STATES of America,

v.

Ruben FELIX, Defendant.

No. CRIM 99–10246–NG.

United States District Court, D. Massachusetts.

March 19, 2001.

Nadine Pellegrini, United States Attorney's Office, Boston, MA, for U.S.

Charles P. McGinty, Federal Defender Office, Boston, MA, for Rubin Felix, Defendant.

### MEMORANDUM AND ORDER RE: MOTION TO SUPPRESS

GERTNER, District Judge.

## I. INTRODUCTION

The defendant, Ruben Felix ("Felix"), is charged in a two-count indictment. Count one charges Felix with a violation of 18 U.S.C. § 922(g)(8), relating to the unlawful possession of a firearm by an individual subject to a domestic violence protective order. Count two charges Felix with possession of an unregistered firearm in violation of 26 U.S.C. § 5861(d).

Felix, a former police officer for the City of Salem, Massachusetts, now moves to suppress all items seized by the Salem Police Department ("the Department") during a warrantless search of his home on March 12, 1999. Felix argues that the police exceeded the scope of the consent to search provided by his wife, Gloria Felix ("Ms. Felix"), in that the police did not abide by Ms. Felix's express limitations on the search. The police entered the house prior to her arrival and searched without her being present despite her explicit instructions to await her arrival before they set foot in her home.

The government opposes the motion, claiming Ms. Felix's consent was given voluntarily and "without limitation." In any event, the government asserts, even if the police did not abide by Ms. Felix's instructions to await their arrival, the search of the home and the discovery of the weapons was "inevitable." It did not matter whether they arrived at the Felix residence at 4:00 p.m., against Ms. Felix's instructions, or at 5:30 p.m., consistent with her consent. The detectives still would have found the sawed-off shotgun.

I held several days of evidentiary hearings on Felix's motion to suppress. The defendant and the government submitted briefs and affidavits both before and after the hearings. Resolution of the motion reduces to two issues. The first issue, a question of fact, requires a credibility determination: Whether I believe Ms. Felix's testimony that she extended limited consent to search her residence, in her presence, for firearms, or the testimony of two police officers that her consent was given without limitation as to time or manner. The second issue presents a mixed question of law and fact: Even if the police ignored Ms. Felix's express limitations on the search, what difference does that make under the Fourth Amendment? One way or the other, the government argues, the police would have searched the Felix home, and were bound to discover the sawed-off shotgun.

After hearing the testimony and reviewing the record before me, I conclude the police did exceed the scope of Ms. Felix's consent to search Felix's house, and further, that the "inevitable discovery" doctrine does not apply. Felix's Motion to Suppress [docket # 28] is **GRANTED**.

## II. FACTS

I am obliged to consider not only whether Ms. Felix imposed limits on the officers' search by the language of her consent, but whether, in light of all the circumstances, it was objectively reasonable for the police to believe that there were no such limits— that they could enter the Felix house at any point before Ms. Felix met them and allowed them access to the home. *United States v. Turner*, 169 F.3d 84, 87 (1st Cir.1999) [hereinafter *"Turner"*].

### A. Events Prior to the March 12 Search

### 1. Ms. Felix's Plan to Separate from Ruben Felix

Approximately two weeks prior to March 12, 1999, Ms. Felix decided to sepa-

rate from Felix due to his alcohol abuse and marital infidelities. To avoid conflict with Felix over the separation, Ms. Felix covertly planned to move out of their house. She enlisted the support of friends and coworkers. She sought to lease an apartment in Salem, which Ms. Felix and her daughter, Marcy Felix ("Marcy"), could then move into following the couple's separation. Ms. Felix encountered difficulties in leasing an apartment, however, as she did not have money to pay first and last month's rent up front.

On a suggestion from a friend, Julie Medina, Ms. Felix contacted Salem Police Officer Michael LaRiviere, who serves as the Department's domestic violence liaison officer. Ms. Felix believed Officer LaRiviere's position enabled him to secure housing for women who were attempting to leave abusive husbands. Although Ms. Felix informed Officer LaRiviere that her husband did not physically abuse her, he suggested she obtain a restraining order against him. Officer LaRiviere declined to provide Ms. Felix with housing assistance at the time.

During the week prior to March 12, Ms. Felix informed her five coworkers at Salem's Assessor's Office that she intended to leave Felix and move to a new apartment. She asked them to help her move furniture. They agreed.

### 2. *The March 11 Meeting*

On March 11, 1999, Ms. Felix signed a lease and obtained the keys to a new apartment. She intended to move the very next day. Later in the afternoon of March 11, one of Ms. Felix's coworkers, Allison Thibideau ("Thibideau"), called the employees of the Assessor's Office to a meeting in their workplace at City Hall.[1] The purpose of the meeting was to finalize Ms. Felix's plan to move to the new apartment.

Thibideau told Ms. Felix a woman from a local domestic violence support group, Help for Abused Women and Children ("HAWC"), would be present at the meeting. As it turned out, there were three unexpected guests at the meeting: Sergeant Thomas Griffin, Officer LaRiviere, and HAWC representative Gail Martin ("Martin").

Prior to the meeting, Salem's Chief of Police informed Captain Paul Tucker that such a meeting would take place.[2] Captain Tucker asked Sergeant Griffin to attend. Sergeant Griffin, in turn, asked Officer LaRiviere to accompany him. Officer LaRiviere then extended an invitation to Martin.

At the meeting, several of Ms. Felix's coworkers expressed their desire that Ms. Felix have police present at her home while her coworkers moved furniture. Ms. Felix inquired of Martin and the police officers as to how she could get a police escort. Martin informed Ms. Felix that she needed to obtain a restraining order against her husband to ensure a police presence and to legitimize the removal of her daughter Marcy from Felix's home. In fact, several of the coworkers communicated to Ms. Felix their unwillingness to participate in the move unless she obtained a restraining order against Felix. Ms.

---

1. Up to this point, Ms. Felix was not aware that any meeting was scheduled to take place. She had met separately with each of her coworkers and informed them of her intentions. The coworkers who attended the meeting included Thibideau, Alicia DeOrio, Frank Hewlick, and Damien Johnson.

2. Tucker did not disclose how or why the Chief of Police acquired knowledge of the meeting.

Felix agreed to obtain the restraining order to "keep things calm" with Felix and to make her coworkers feel safe. She planned to meet Martin at the Salem District Court the next morning for the purpose of applying for the order.

### 3. *Participation of the Salem Police*

It is worthwhile to pause in this recitation of the facts, to address the question of the participation of certain Salem police officers in Felix's marital problems. The defendant suggests that certain officers were "out to get him" because of his past troubles, and took advantage of the couple's separation. It is true that Felix had a troubled history with the Department, serving for fifteen years prior to his termination in October of 1998. It is also true that some of the officers involved in Felix's termination were also involved in the events surrounding the March 12 search (Sergeant Griffin, Captain Tucker, and to a lesser degree, Lieutenant Audrey Sullivan). The subjective motivation of these officers, however, is of little legal relevance to the ultimate objective determination— whether it was reasonable for the police to believe there were no limits on the scope of Ms. Felix's consent to search her home. *Cf. Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

The past dealings these officers had with Felix, and in particular, the extent to which they may have been committed to his ouster from the Department, is relevant only in evaluating their credibility. If this search stands, and Felix is convicted, any hope of his returning to the police force may be dashed.

Captain Tucker headed the Department's internal affairs unit. He presented the Department's case against Felix at the termination hearing in 1998. Sergeant Griffin assisted Lieutenant Audrey Sullivan in an investigation of Felix, which contributed to Felix's demise as a police officer. Sergeant Griffin subsequently testified against Felix at the hearing.[3]

The 1998 disciplinary action stemmed from a 1997 incident. At that time, an acquaintance of Felix, Stephanie Matthews, obtained a permanent restraining order against him. Pursuant to this restraining order, Felix was required to surrender all firearms, and his license to carry firearms, to the Department. Captain Tucker and another officer visited the Felix home in 1997 and ordered the Felixes to surrender any firearms they owned or possessed pursuant to the restraining order. Felix then surrendered several firearms to Tucker.

In March of 1999, an arbitration hearing was scheduled through which Felix sought to be reinstated as a Salem police.

### 4. *The Morning of March 12*

On the morning of March 12, 1999, Ms. Felix met Alicia DeOrio ("DeOrio"), her coworker, at City Hall. They went to the Salem District Court together. There, they met Martin in the Clerk's Office. Officer LaRiviere also was present at the courthouse when Ms. Felix and DeOrio arrived.

Ms. Felix applied for a temporary restraining order against Felix. The application requested that Felix be kept away from their home "until 10:00 p.m." the evening of March 12 to give Ms. Felix "a chance to safely move out." In the affidavit supporting Ms. Felix's application for a protective order, Ms. Felix alleged the fol-

---

**3.** Together, Lieutenant Sullivan, Sergeant Griffin, and Officer LaRiviere formed the Department's domestic violence unit.

lowing, not all of which was true: She claimed that Felix was verbally abusive towards Ms. Felix, and both physically and verbally abusive towards Marcy; Ms. Felix and Marcy were afraid of Felix; and Felix had a history of violence. She admitted during the hearing before me that she had falsified the allegation of physical abuse, upon encouragement by Martin, to get the restraining order.

While she lied about the presence of physical threats in Salem District Court, she made no entry in "Box E" of the application which asked her to list any firearms, ammunition, or firearms licenses the defendant possesses.

The district court granted the protective order at 11:00 a.m. Ms. Felix and DeOrio waited outside the courthouse for several minutes while Officer LaRiviere obtained the police copy of the order. After obtaining a copy of the signed order, Officer LaRiviere met Ms. Felix and DeOrio outside of the courthouse. He offered to drive the women to the Salem High School where Ms. Felix planned to take Marcy out of school early. The women agreed.

### 5. *Ms. Felix's Consent*

Once in his car, Officer LaRiviere indicated that he needed to stop at the police station.[4] Ms. Felix agreed. On the way, Officer LaRiviere asked Ms. Felix if there were any guns in the house, which Felix would have to surrender pursuant to the protective order. Ms. Felix informed him that her brother-in-law, Luis Felix ("Luis"), lived in the basement of her house and Luis owned a gun.

At the police station, Officer LaRiviere asked the women to wait inside while he took care of his business there. Ms. Felix and DeOrio did so.[5] While Ms. Felix waited at the police station, Lieutenant Sullivan and Officer LaRiviere performed a record search to determine whether Felix or his brother Luis had any firearms registered to them. Lieutenant Sullivan informed Captain Tucker that at least one gun registered to Felix was unaccounted for under the prior restraining order obtained by Stephanie Matthews.[6]

Ms. Felix waited for Officer LaRiviere for ten or fifteen minutes. She then went

---

4. Driving distance from the courthouse to the high school is approximately five minutes. The Salem police station is on the way from the courthouse to the high school.

5. I credit Ms. Felix's testimony that DeOrio was at the police station with Ms. Felix, though DeOrio seemed determined to avoid answering any questions about this visit when she testified before this Court. DeOrio related that she and Ms. Felix left the Salem District Court with Officer LaRiviere at approximately 11:00 a.m. and arrived at the high school at approximately 11:50 a.m. It takes only five minutes to drive from the courthouse to the high school. Inexplicably, DeOrio could not account for the forty-five minute lapse, though she remembered virtually every other pertinent detail of the events of March 11 and 12. DeOrio was certain, however, that Ms. Felix did not go to the police station *after* they picked up Marcy at the high school because Ms. Felix and Marcy accom-

panied DeOrio to Joanne Bogle's house. Furthermore, on cross-examination, DeOrio said she could not recall if she was present at a March 12 meeting with Captain Tucker at the police station. First Transcript of Suppression Hearing, Sept. 11, 2000, at 38. But DeOrio's presence at the police station is confirmed by her own testimony on direct examination when she admitted that Captain Tucker gave her his telephone number that day so that the women could contact him later that afternoon. *Id.* at 12.

The only version of events that makes any sense, and which ties DeOrio's loose ends together, is the story told by Ms. Felix: DeOrio encountered Captain Tucker at the police station on the morning of March 12 before Officer LaRiviere drove the women to the high school.

6. On the stand, Officer LaRiviere denied that he knew of such a record search. Captain

to look for him because she wanted to leave for the high school. She found Officer LaRiviere speaking with Captain Tucker inside Captain Tucker's office. She informed Officer LaRiviere that she wanted to leave. Officer LaRiviere said he would be back in a moment.

Shortly thereafter, both Officer LaRiviere and Captain Tucker came to an interview room where Ms. Felix was waiting. Captain Tucker, not Mrs. Felix, raised the possibility of Felix possessing firearms in the Felix residence. Captain Tucker informed Ms. Felix that the police believed there to be one firearm registered to Felix that Felix did not surrender to police pursuant to Stephanie Matthews' protective

Tucker's report, dated March 12, contradicts Officer LaRiviere:

> On 3/12/99 this writer was briefed by domestic violence investigator that Gloria Felix was at Salem District Court attempting to procure a restraining order against her husband Ruben Felix. Mrs. Felix did obtain such an order and came to the Salem police station with the paperwork. During this time Officer LaRiviere and Lt. Audrey Sullivan of the domestic violence unit checked to see if Ruben Felix had any weapons registered to him or to his brother Luis Felix who also resides at the Highland Avenue address. Lt. Sullivan told this writer that at least one gun that was registered to Ruben Felix was unaccounted for from a previous restraining order from a different plaintiff. All guns registered to him were to have been turned in to Salem Police as well as any guns that were in his possession. Officer LaRiviere had a conversation with Gloria Felix relative to any guns that may be in the house including at least the one that was not accounted for.

Defendant's Exhibit 5. Not only does this quoted passage fill in the gap in Officer LaRiviere's memory, it corroborates Ms. Felix's testimony that it was the police, not Ms. Felix, who first raised the issue of firearms. Ms. Felix had not been concerned enough about the possibility of Felix's possessing firearms to have noted it on her application for a restraining order.

order.[7] Ms. Felix pointedly did not agree. She indicated that her husband surrendered all of his firearms to Captain Tucker in 1997, including the particular weapon in which Captain Tucker expressed an interest.[8] Captain Tucker pressed his belief that Felix still had one firearm in the house. He told her the police needed to search the house for it.

It was at that point that Ms. Felix agreed to let the Salem Police into her house to search for firearms, but it was not an unequivocal consent.[9] She agreed to meet Captain Tucker at her home prior to moving out her furniture, at which time she would grant access to the Salem Police. She did not give Captain Tucker a key; he did not ask for one, which, pre-

7. Ms. Felix understood Captain Tucker to be concerned about a small .22 caliber handgun Felix used to own.

8. It is important to note that Ms. Felix had reason to know whether any firearms remained in her home, and to doubt Captain Tucker's information. Ms. Felix previously held a license to carry a firearm and, in fact, had fired and carried firearms during that time. She was not inexperienced with respect to firearms, and generally speaking, she was not afraid of them. She surrendered her license to carry, along with the weapons Felix owned, to Captain Tucker in 1997. Fourth Transcript of Suppression Hearing, Nov. 22, 2000, at 53–54.

9. Ms. Felix's recollection is that she told Captain Tucker she would meet him at 5:30 p.m., and that she actually arrived at her house at that time. Captain Tucker's testimony suggests Ms. Felix indicated to him that she would arrive at her home at 5:00 p.m., and that she actually arrived at approximately 5:00 p.m. *See* Third Transcript of Suppression Hearing, Sept. 21, 2000, at 133, 136. Whether Ms. Felix stated 5:00 or 5:30 p.m. at the police station is irrelevant. She clearly conveyed that she would meet Captain Tucker at the home, just prior to moving out, and let him in to conduct the search.

sumably, he would have done if he believed that he had her unconditional consent to search the house at any time. And, although the conversation took place at the police station—a place where there may well be consent forms, or at least pencils and papers—Captain Tucker did not ask her to memorialize her consent in a written document. Indeed, Captain Tucker made no mention of getting Ms. Felix's consent at all in his March 12 report.[10]

Before leaving the police station, Ms. Felix obtained a police-issue cellular telephone from Officer LaRiviere, which was to be used in the event of an emergency. She also completed paperwork so that a security alarm could be installed in her new apartment.

### 6. The Afternoon of March 12

After her visit to the police station, Ms. Felix accompanied Officer LaRiviere and DeOrio to the Salem High School. They arrived at approximately 11:50 a.m. Ms. Felix went into the school but she was ten minutes early. She returned to Officer LaRiviere's car to wait for Marcy to be released at noon. Again, Officer LaRiviere raised the Department's need to search the Felix home. While Ms. Felix agreed that any guns in the house should be taken, Ms. Felix and Officer LaRiviere did not discuss the details of the search.[11] She did not retract the limitations she placed on the search (i.e., when it was to take place, and that she was to be there).[12]

At noon, Marcy was released from school. Officer LaRiviere drove DeOrio, Ms. Felix, and Marcy to DeOrio's car, which was parked near City Hall at a garage on New Liberty Street. Ms. Felix and Marcy got into DeOrio's car. They then drove to the home of a friend, Joanne Bogle. DeOrio, Ms. Felix, and Marcy spent the next several hours accompanying Bogle to a doctor's appointment at Massachusetts General Hospital in Boston. Ms. Felix remained at Bogle's house until approximately 5:00 p.m.

### B. The March 12 Search of Felix's House

Captain Tucker did not wait for Ms. Felix's return to the home. He did not

---

10. Although he admitted on cross-examination that this conversation was of crucial importance, especially since he was the officer responsible for conducting the search, he made absolutely no mention of his conversation with Ms. Felix. See Defendant's Exhibit 5. On the stand, he could not describe the conversation in any detail, insisting only that Ms. Felix "confirmed to me what she had told Officer LaRiviere."

11. While Captain Tucker did not secure Ms. Felix's consent in writing, he did ask DeOrio for a signed statement describing Ms. Felix's conversation with Officer LaRiviere at the high school. That statement provides no basis for doubting Ms. Felix's testimony:

On March 12, 1999 Michael LaRiviere, Gloria Felix and myself were sitting in front of Salem High School at 11:50 a.m. waiting for Marcy Felix to be released from school. Gloria said that it was okay for Mike to

check the house for guns. Gloria did know that there was at least one gun in the house and wanted to make sure that it was found. Defendant's Exhibit 4. The police obtained this statement from DeOrio on March 16, 1999—four days after the search.

12. Ms. Felix had already made the necessary arrangements with Captain Tucker, who was responsible for conducting the search. As Officer LaRiviere testified, it was Captain Tucker's conversation with Ms. Felix that determined the scope of her consent: "I didn't have any conversation regarding entry to the premises or service of the restraining order. . . . I transferred the information to Capt. Tucker is what I did." Second Transcript of Suppression Hearing, Sept. 20, 2000, at 122–23. In fact, as a patrol officer, Officer LaRiviere was not even authorized to perform a search of Felix's home. Internal affairs investigators, such as Captain Tucker and Sergeant Griffin, would handle the search. Id. at 124.

wait for her to let him in with her key at the appointed time. Rather, Captain Tucker took a house key from Felix himself at 4:00 p.m. in the following way:

Captain Tucker determined that the Salem Police should serve Felix with the protective order away from Felix's house for safety reasons. Shortly after 3:00 p.m., Captain Tucker, Sergeant Griffin, and other officers staked out Felix's Highland Avenue address after they determined that Felix was still at home. Shortly before 4:00 p.m., Salem police officers followed Felix as he drove away from his house. Captain Tucker and Sergeant Griffin stopped Felix a few blocks away and served him with the temporary restraining order. Captain Tucker informed Felix that Ms. Felix had consented to a search of Felix's house. Either Captain Tucker or Sergeant Griffin removed Felix's key from the ignition. The car key was attached to the key ring holding Felix's house key. At that point, Captain Tucker placed Felix in the back of a squad car and drove Felix back to the house. Sergeant Griffin followed in a second vehicle.

Felix informed Captain Tucker that Luis was still in the house. Upon questioning by Captain Tucker, Felix maintained that there were no firearms in the house, except possibly a firearm owned by Luis. Then, Captain Tucker used the house key he had seized from Felix to open the side door. Felix did not consent to the temporary seizure of his person, nor did he consent to the temporary seizure of his key by Captain Tucker.

After unlocking the door, Captain Tucker returned the key ring to Felix and told Felix to leave. Sergeant Griffin transported Felix back to Felix's car, which was still parked on the side of the road. Luis came upstairs from his basement apartment to meet the detectives. Luis surrendered a newly purchased handgun and his license to carry to them. The officers told Luis he could return to the house after 10:00 p.m.

Ms. Felix was not present at this time.[13] Police officers commenced a thorough search of Felix's home in her absence. Sergeant Griffin located and seized one sawed-off shotgun and a bulletproof vest, which were found under the couple's bed. Indeed, although the search was ostensibly for firearms, the officers seized "transcripts from a departmental hearing regarding the defendant's termination from employment with the Salem Police Department." The government does not disclose where these papers were found.[14] At no point did the police secure a search warrant.

Ms. Felix arrived at her home approximately one hour after Captain Tucker arrived there. She expected to find her home empty and the doors locked. Instead, she found approximately eight police officers in and around her house. Captain Tucker reported the fruits of the search to Ms. Felix, but she did not confront him about the police's entry of the premises prior to her arrival.[15] She pro-

---

13. Shortly after 4:00 p.m., Captain Tucker attempted to contact Ms. Felix at Joanne Bogle's house. (Earlier, Captain Tucker provided DeOrio with his cellular telephone number so that Ms. Felix could reach him that afternoon. DeOrio called Captain Tucker when the women returned from the hospital and gave him the number at Bogle's house.) Ms. Felix refused to speak with Captain Tucker.

He then informed DeOrio that Felix had been served with the restraining order.

14. Government's Motion in Opposition to Defendant's Motion to Suppress at 2.

15. The government emphasizes the fact that Ms. Felix did not express her displeasure with the officers on the evening of March 12. It

ceeded to her bedroom, asked the police officer there to step out, and quickly commenced packing her belongings for the move.

## C. *Ms. Felix's April 1999 Statements to Police*

At least as early as April 8, 1999, Ms. Felix expressed her displeasure over the improper entry of her home to law enforcement officials. On that date, Sergeant Griffin and Agent Bill Murphy of the Bureau of Alcohol, Tobacco and Firearms, made an unannounced visit to Ms. Felix at City Hall where she worked. Sergeant Griffin recalled that Ms. Felix informed him and Agent Murphy that she had wanted the Salem Police to wait to search until she arrived at the house.[16]

In summary, I fully credit Ms. Felix's testimony that she extended limited consent to search her house. I base my findings not only on Ms. Felix's affect, but also on the independent corroborating evidence throughout the record. Ms. Felix's version of events was clear and detailed, as well as entirely consistent with her statements prior to the hearing and certain objective factors, such as the failure of the police to get a key to her house. By contrast, Captain Tucker and Officer

LaRiviere's testimony was strained and confused at best, especially on the most important issues—the language of Ms. Felix's consent, and the context and manner in which her consent was given. DeOrio's testimony bolsters Ms. Felix's account by corroborating certain key facts, despite DeOrio's apparent attempt to avoid testifying about Ms. Felix's visit to the police station that day. Quite simply, Ms. Felix offered the only story that makes any sense.

## III. *LEGAL DISCUSSION*

The parties agree that Ms. Felix voluntarily consented to a search of Felix's house for the purpose of finding any firearms.[17] The question is whether the police exceeded the scope of Ms. Felix's consent by searching the house before Ms. Felix arrived to let them in, and in her absence. I find that the search did exceed the scope of Ms. Felix's consent, in more ways than one. I conclude that the search was unreasonable, and in plain violation of Felix's rights under the Fourth and Fourteenth Amendments.

## A. *The Right to Limit the Scope of a Consent Search*

Under the Fourth and Fourteenth Amendments, it is well settled that a

---

seems entirely reasonable, given the emotional significance of Ms. Felix's separation from her husband (by all accounts, she was upset), that Ms. Felix just wanted to get the move over with and did not want to confront the officers that night.

**16.** The government's attempt to undermine Ms. Felix's credibility via the "pension theory" fell flat: Sergeant Griffin testified that Felix will lose his pension with the Department if he is convicted of the instant charges. If that happens, the government argues, Ms. Felix will be unable to perfect any interest she has in Felix's pension through the pending divorce proceedings. Thus, the government claims Ms. Felix lied about the limitations on her consent to prevent Felix's conviction.

But the record suggests that Ms. Felix was not aware of any right she may have to a portion of Felix's pension at the time she *first* began complaining about the Department's improper search. Ms. Felix complained of the improper police conduct to Sergeant Griffin and Agent Murphy at least by April 8, 1999. Ms. Felix's uncontradicted testimony is that she did not know what rights, if any, she may have with respect to the pension so soon after the search. Fourth Transcript of Suppression Hearing, Nov. 22, 2000, at 74–75.

**17.** As Ms. Felix had "common authority" over the premises, she could give valid consent to search the defendant's home. *United States v. Donlin*, 982 F.2d 31, 33 (1st Cir.1992).

search conducted without a warrant issued upon probable cause is per se unreasonable, subject only to a few specifically established and well-delineated exceptions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Id.*

 The scope of a consent search, however, may not exceed the scope of the consent given to law enforcement officials. *See Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) [hereinafter *"Jimeno"*]. In *Jimeno*, the Supreme Court of the United States noted: "A suspect may of course delimit as he chooses the scope of the search to which he consents." *Id.* at 252, 111 S.Ct. 1801. In other words, the individual's power to consent to a search necessarily entails the right to withhold consent altogether, to limit the consent search in any manner, to revoke one's consent (prior to the discovery of evidence by police), and to terminate a search already in progress. *See Turner*, 169 F.3d at 89 (finding that defendant had no meaningful opportunity to object to search that exceeded scope of initial consent); *United States v. Infante–Ruiz*, 13 F.3d 498, 505 (1st Cir.1994) (holding that the police may not search a closed container in the trunk of an automobile if the consenting individual grants general permission to search the trunk but withholds permission to search that particular container) [hereinafter *"Infante–Ruiz"*]; *United States v. Jachimko*, 19 F.3d 296, 299 (7th Cir.1994) (noting individual's right to revoke her consent to search).

 Plainly, if the police have chosen to search with consent—rather than with a warrant—the Constitution requires them to comply with any time or manner limitations imposed by the consenting party.[18] *Jimeno*, 500 U.S. at 252, 111 S.Ct. 1801. The government bears the burden of proving by a preponderance of the evidence that the search remained within the scope of the consent given. *Turner*, 169 F.3d at 87 n. 3.

## B. *The Standard for Determining the Scope of a Consent Search*

 The standard for measuring the scope of a person's consent is that of "objective" reasonableness. A court must ask: "What would the typical reasonable person have understood by the exchange between the [police] officer and the [person consenting]?" *Jimeno*, 500 U.S. at 251, 111 S.Ct. 1801. In making this inquiry, the *Jimeno* Court instructs: "The scope of a search is generally defined by its expressed object." *Id.* In other words, if the police express their intent to search an area for a firearm, the scope of the search is limited by what is necessary to accomplish this task. The police may not search computer files or personal papers if consent has been given to locate firearms or narcotics. *E.g., Turner*, 169 F.3d at 88–89 (where consent search was limited to places in home where an intruder might have disposed of physical evidence of a sexual assault, police could not search defendant's computer hard drive); *United States v. Dichiarinte*, 445 F.2d 126, 129–30 (7th Cir.1971) (where consent search was limited to places where the defendant might have hidden narcotics, police could not read defendant's personal papers).

18. For example, the police cannot conduct a consent search before their authority to do so vests, or after that authority expires. *See United States v. Reid*, 19 F.Supp.2d 534, 539 (E.D.Va.1998) (upholding search of vehicle conducted two days after consent was granted because the individual placed no "temporal limitation" on her consent).

## C. Ms. Felix Placed Limitations on Both the Time and Manner of the Search

The government contends that, "[a]t no time did [Ms. Felix] place any conditions upon the consent or any limitations as to time and manner." This assertion does not withstand even the most superficial scrutiny.

Ms. Felix granted the police permission to search Felix's house under several conditions. The police were to enter her home after she arrived to meet them, after she had unlocked the house. They were to perform the search in her presence. And finally, they were to search for the limited purpose of locating firearms. These limitations fall into two categories—time and manner restrictions.[19]

First, Ms. Felix unambiguously limited the time period during which the police should have performed the search.[20] The police were to conduct the search before her coworkers began moving furniture out of the house but after Ms. Felix allowed the police access to the home. The police, therefore, could not have conducted the search after Ms. Felix moved out of the Felix house (e.g., on March 13) without exceeding the limitations of Ms. Felix's consent. The authority to search expired the evening of March 12.

Nor was it objectively reasonable for the Salem Police to search the home before Ms. Felix met Captain Tucker. The purpose of the police presence was only to protect Ms. Felix and possibly her coworkers. Felix was out of the house by the time she arrived, so that concern was largely prophylactic. The police had no "need" to enter the house when they did. They did not have probable cause. Ms. Felix's consent framed their only justification to enter, and the scope of the resulting search.

Second, Ms. Felix expressed her desire that the police search in her presence. Since Ms. Felix was not present in the end, we cannot now know what limitations she would have placed on its physical or "geographic" scope.

Third, she did not authorize Captain Tucker to search for any items other than firearms. The expressed object of the search carried an implicit corollary: The officers could search only the areas, containers, or effects which could conceal a firearm. For example, the police could not search Felix's personal papers.

## D. The Salem Police Exceeded the Scope of Ms. Felix's Consent

■ Considering the exchanges between Ms. Felix and the police officers, it was objectively unreasonable for either Captain Tucker or Officer LaRiviere to believe the police could search Felix's house before Ms. Felix met them at the house. Tucker exceeded the scope of the consent search by seizing Felix's key and entering the house an hour before Ms. Felix arrived, unbeknownst to her. The

19. At the police station, Ms. Felix apparently did not limit the physical areas or containers within the house that could be searched. *Cf. Jimeno,* 500 U.S. at 251, 111 S.Ct. 1801 ("[I]t was objectively reasonable for the police to conclude that the general consent ·to search respondent's car included consent to search containers within that car which might bear drugs."). Of course, she intended to be present during the search and she could later limit the search.

20. In addition to her express language at the police station, Ms. Felix evidenced her intent as she did not provide Captain Tucker with a house key nor invite him to employ an alternative means of entering the house. Among other things, this ensured that the police would not damage her property by breaking into the home.

search plainly violated the Fourth Amendment.

Indeed, one of the most troubling aspects of this search is the seizure of the hearing transcripts. That seizure suggests a complete disregard for the restrictions placed on the police authority to search the Felix home.[21] Nothing about those transcripts pertained to the limited mission at hand, a search for firearms. *See United States v. Padilla*, 986 F.Supp. 163, 170 (S.D.N.Y.1997) (documents are not "immediately incriminatory on their face" and thus require greater examination by police).

### E. *The Inevitable Discovery Doctrine*

The government contends that even if the police performed an unlawful search, the search *inevitably* would have occurred when Ms. Felix arrived, and the search *inevitably* would have uncovered the evidence. Accordingly, the doctrine of "inevitable discovery" applies, and the evidence should be admitted regardless of any police overreaching. *Nix v. Williams*, 467 U.S. 431, 447, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *United States v. Rogers*, 102 F.3d 641, 646 (1st Cir.1996).

█ █ Generally, the inevitable discovery doctrine applies where the government proves that there is "a high probability" that the evidence would have been discovered by some independent, lawful means.[22] *Rogers*, 102 F.3d at 646. The First Circuit's analytical framework for the inevit-

able discovery rule requires that I ask three questions: " '[A]re the legal means truly independent; are both the use of the legal means and the discovery by that means truly inevitable; and does the application of the inevitable discovery exception either provide an incentive for police misconduct or significantly weaken fourth amendment protection?' " *United States v. Ford*, 22 F.3d 374, 377 (1st Cir.1994) (quoting *United States v. Silvestri*, 787 F.2d 736, 744 (1st Cir.1986)) [hereinafter *"Ford"*]. Under this "flexible standard," independence and inevitability remain the cornerstones of the analysis. *Id.*

█ Thus, the government must answer the following questions: (1) Can the government show an "independent" means at all where the allegedly unlawful entry and the lawful entry are justified in the same way—by Ms. Felix's consent; (2) is it the case that a consent search inevitably would have occurred at 5:30 p.m., and the evidence inevitably would have been discovered during that search; and, (3) does the application of the inevitable discovery exception to the facts of this case provide an incentive for police to ignore the express directives of a citizen? *Id.*

### 1. *The "Independent" Means Requirement*

As to the first point, the police had no "independent" means for entering the house apart from Ms. Felix's consent. The government's argument is circular,

---

21. Of course, the Salem Police could seize any evidence of a crime they found in plain view from a lawful vantage point while searching the home for firearms. *Horton v. California*, 496 U.S. 128, 136, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). The plain view doctrine might have justified the seizure of the bulletproof vest if, in fact, the officers were authorized to be in the house searching for firearms at the time they discovered the vest. *Id.*

22. In *Nix*, for example, voluntary search teams inevitably would have located the body of a murder victim using entirely appropriate investigative techniques regardless of any overreaching by the police during an interrogation of the suspect. *Nix*, 467 U.S. at 449–50, 104 S.Ct. 2501.

and has been rejected in analogous situations involving search warrants.

As one court noted: "The inevitable discovery doctrine cannot rescue evidence obtained via an unlawful search simply because probable cause existed to obtain a warrant when the government presents no evidence that the police would have obtained a warrant." *United States v. Allen*, 159 F.3d 832, 842 (4th Cir.1998) (citing cases). That is, an officer cannot justify a warrantless search on the ground that she *could have* obtained a warrant—she had the requisite probable cause and time to obtain one—but she did not take any steps to do so. If a warrantless search were justified on this ground, the warrant requirement would be eviscerated whenever probable cause exists. However likely it is that a magistrate would issue a warrant, the police lack the authority to cross the threshold of a citizen's home without its authorization (other than in exceptional circumstances).

Likewise in the consent search context: Where the officers' sole authority for entering a home is consent to search at a particular time, they cannot justify entering the home in violation of those conditions on the ground that they "inevitably" would have entered the home at a later time which "would" have complied with the consent given. Indeed, such an approach would vitiate any time and manner restrictions on the scope of consent.

Even if Ms. Felix's consent was "likely," even "inevitable," at 4:00 p.m. or 4:30 p.m., the police did not have her authorization to search until 5:30 p.m. when she would be present. Without her consent (or some independent justification absent from this case), the Salem Police had no right to enter her home when they did. The inev-

itable discovery doctrine cannot rescue the evidence obtained via the unlawful search simply because the officers probably would have discovered the evidence if they had not exceeded the scope of consent.

## 2. *The "Inevitability" Requirement*

In any event, the discovery of the disputed evidence was not inevitable on the specific facts of this case. First, neither the consent search itself, nor the discovery of the evidence pursuant to Ms. Felix's consent, was truly "inevitable." *Ford*, 22 F.3d at 377. Ms. Felix retained the right to revoke her consent, or to expressly limit a consent search already in progress, before the police discovered the evidence they sought. *Turner*, 169 F.3d at 89; *United States v. Jachimko*, 19 F.3d 296, 299 (7th Cir.1994). As a general matter, a consent search itself can hardly be deemed inevitable given the consenting party's power to revoke her consent at any time.

But the government's argument is even more severely flawed. Here, the evidence shows Ms. Felix expressed some reservations about allowing the police into her home at all. The search was not Ms. Felix's idea, but the Department's. It is entirely possible she would have revoked her consent had the officers actually waited for her to arrive, when she realized her husband was not there and that she could safely move out.[23] Ms. Felix also expressed her desire to be present at the time of the search, which preserved her ability to control its scope in various ways. Consequently, she could have limited the search to physical areas of the home where the firearm would not have been found (i.e., areas other than her bedroom).

---

**23.** Indeed, Ms. Felix refused to speak with Captain Tucker just prior to the search. Ms. Felix's misgivings both at the police station and later that afternoon may well have prompted Captain Tucker to seize Felix's keys to gain entry to the house.

### 3. *The Policy Consideration*

Finally, the application of the inevitable discovery exception would provide an incentive for police misconduct and significantly weaken Fourth Amendment protection in the consent search context. *Ford,* 22 F.3d at 377. In fact, the exception would swallow the rule: The police could simply ignore time and manner limitations on their right to conduct a consent search, and thereby bypass the Fourth Amendment's reasonableness requirement entirely, by pointing to a hypothetical consent search they never performed.

## IV. *CONCLUSION*

However well-intentioned the Salem Police were in this case, their search of Felix's home before Ms. Felix's arrival, using Felix's key, clearly exceeded the scope of Ms. Felix's consent. The search, therefore, violated Felix's right to be free from unreasonable searches and seizures under the Fourth and Fourteenth Amendments. The inevitably discovery exception does not apply. *Ford,* 22 F.3d at 377. The evidence seized from Felix's house must be suppressed. *Infante–Ruiz,* 13 F.3d at 505. Accordingly, Felix's Motion to Suppress is **GRANTED.**

**SO ORDERED.**