UNITED STATES of America

v.

Marcel HENDERSON

No. CR.01–10264–MLW.

United States District Court,
D. Massachusetts.

Nov. 4, 2002.

Timothy Watkins, Boston, MA, for Defendant.

Colin G. Owyang, U.S. Atty's Office, Boston, MA, for U.S.

### MEMORANDUM AND ORDER

WOLF, District Judge.

## I. SUMMARY

Defendant Marcel Henderson is charged in a one count indictment with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Henderson filed a motion to suppress the firearm in question and any other items observed or seized during a search and seizure of him on May 10, 2001. On October 22 and 23, 2002, the court conducted an evidentiary hearing concerning this motion. For the reasons described below, the court is denying Henderson's motion to suppress.

## II. FINDINGS OF FACT

The following facts are proven by a preponderance of the evidence. On the night of May 10, 2001, Henderson was riding in the front passenger seat of a 1990, standard transmission Nissan Stanza bearing Massachusetts license plate 7446MF. The car was being driven by its owner, Patrice Alford.

On May 10, 2001, Michael Kominsky, a police officer of the Town of West Bridgewater, was working the 4:00 p.m. to 12:00 midnight shift in a marked police cruiser. At about 10:30 p.m., Kominsky and Alford each approached the intersection of Plain Street and Waverly Park Avenue in Brockton, Massachusetts,[1] at approximately the same time. Alford was driving south on Plain Street. Kominsky was driving west on Waverly Park Avenue. Kominsky waited for Alford to drive past the intersection and, making a left turn, pulled out behind her on Plain Street.

At this time, Alford was trying to drive from Brockton to Boston and was lost. She was looking for signs and driving slowly, approximately 20 miles per hour. The speed limit for the pertinent portion of Plain Street is 35 miles per hour. Alford crossed the solid double yellow line that runs down the middle of Plain Street at least two times, which violated M.G.L.A. ch. 89, § 4A.

Observing Alford's slow driving and multiple marked lanes violations, Kominsky decided to investigate further by querying the Massachusetts Registry of Motor Vehicles ("RMV") about Alford's car. Kominsky's cruiser was equipped with a laptop computer that allows an officer to, among other things, enter a license plate number and receive information about the vehicle and its registered owner.

Kominsky's inquiry about Massachusetts license plate 7446MF was answered quickly by the RMV computers. He learned that the registered owner of the vehicle had a suspended driver's license. Komin-

---

1. Plain Street is a road that runs north to south, and crosses the line between Brockton and West Bridgewater and the line between West Bridgewater and East Bridgewater. Close to the line between West Bridgewater and East Bridgewater, at the point where it crosses Belmont Street, Plain Street "becomes" Pleasant Street. The parties have agreed that the municipality in which particular events took place is not material to the motion to suppress.

sky decided to stop Alford's automobile. He waited, however, until Alford's vehicle came to a place on the road where he would enjoy a "tactical advantage" during the traffic stop. This point soon came and Kominsky activated his overhead flashing lights. Alford pulled over within five to ten seconds. The vehicles were then in the vicinity of the intersection of Pleasant Street and Pleasant Avenue in East Bridgewater. After using his radio to notify the desk officer on duty that he was performing a motor vehicle stop, Kominsky exited his cruiser and approached Alford's vehicle.

Kominsky's cruiser was approximately 30 feet behind Alford's Nissan. Alford's vehicle was illuminated by lights from the police cruiser. These included a hand-held spotlight and "take-down" lights. Take-down lights are two spot lights that come down from the light bar on the cruiser's roof. Kominsky also had a flashlight in his hand when he approached Alford's vehicle and he shined it in the vehicle.

Kominsky asked Alford for her license and registration. She provided the registration, but not her license. When Kominsky asked her why she did not have her license, Alford responded that she thought it might have been suspended because she had unpaid tickets.[2] Alford then confirmed that she was the registered owner of the car.

Alert to possible issues concerning his safety, Kominsky also watched Henderson and accurately observed that he was not wearing his seatbelt.[3] Kominsky then asked Henderson for his license or identification. Kominsky made the request for three reasons. First, Kominsky needed information concerning Henderson's identity in order to issue him a citation for not wearing a seatbelt. *See* M.G.L.A. ch. 90 § 13A; ch. 90C § 3. Second, Kominsky wanted to determine whether Henderson was licensed to drive Alford's car from East Bridgewater since Alford was not authorized to do so. Finally, when Kominsky made a traffic stop at night he typically, but not always, asked for identification from any passenger, as well as from the driver, to determine with whom he was dealing as part of his effort to protect his safety. Thus, it is probable that Kominsky would have demanded that Henderson provide him a license or other adequate identification even if Henderson had been wearing a seatbelt.

Henderson told Kominsky that he did not have a license or any identification. Kominsky instructed Henderson to write his name, date of birth, and social security number on a piece of paper. Henderson asked Kominsky why he had to provide that information. Kominsky did not answer the question, but insisted that Henderson give him the requested information. Kominsky gave Henderson a pen and Henderson wrote his identifying information on a piece of paper that was in the car. Kominsky took that piece of paper to his cruiser.

After returning to his cruiser, Kominsky used his laptop computer to investigate Henderson based on the information he

---

2. Alford was correct. Her license had been suspended for failure to pay a ticket for a moving violation.

3. The court heard conflicting testimony from Kominsky and Alford concerning whether Henderson was wearing a seatbelt. The court also viewed Alford's vehicle. As Alford testified, her Nissan has automatic seatbelts, which move across a passenger's chest when the doors are closed, and lap belts which must be manually fastened. The automatic seatbelts, however, can be easily disconnected. The court is persuaded by a preponderance of the credible evidence that Henderson was not wearing any seatbelt when Kominsky observed him.

had provided. The computer reported that according to the Commonwealth of Massachusetts Warrant Management System (the "WMS"), there was an outstanding 1996 warrant for Henderson's arrest. Kominsky confirmed with the desk officer on duty that the warrant was in the system. Kominsky then asked the desk officer to check Alford's criminal history. The desk officer responded that Alford had no criminal history. Kominsky told the desk officer that he was going to issue a citation to Alford for operating a vehicle after her license had been suspended, in violation of M.G.L.A. ch. 90 § 23, and arrest Henderson. *See* Ex. 5.

Kominsky has training and experience concerning three databases that contain information on outstanding warrants. He has been a police officer since 1997. At the Massachusetts Police Academy he was taught that two systems, the "LEAPS" system, which contains information on older, paper warrants, and the "NCIC" system, at times provide inaccurate information and that their reports of warrants should be double-checked with the issuing agency before being relied upon. He was also taught, however, that the WMS could be relied upon without further inquiry.

Kominsky's experience was consistent with this advice. Kominsky had made more than 100 arrests based solely on WMS information concerning outstanding warrants. That information was accurate in all but one case.[4] In the sole, exceptional case the arrestee had appeared in court earlier that day and been admitted to bail, but the court had not yet updated the WMS.

By the time Kominsky was ready to return to Alford's vehicle, East Bridgewater police officer John Oliveira had arrived on the scene. Oliveira and Kominsky approached Alford's vehicle. Oliveira was on the driver's side. Kominsky was on the passenger's side. Approximately three minutes had elapsed between the time Kominsky went to his car with Henderson's information and when he returned to Alford's vehicle to arrest Henderson.

Kominsky informed Henderson that there was a warrant for his arrest. Henderson denied that. In Kominsky's experience, it is not unusual for a person to deny the existence of a warrant even if a valid warrant has been issued. Kominsky told Henderson to exit the vehicle. Henderson complied. Kominsky then instructed Henderson to place his hands on top of his head. When Henderson hesitated, Kominsky grabbed him and brought his hands up to his head. Holding Henderson's interlaced fingers with his left hand, Kominsky conducted a pat search with his right hand. He felt a magazine for a firearm in Henderson's right pocket. Kominsky asked Henderson if he had anything else that he should know about. Henderson told Kominsky that he had a 9MM pistol in his pants. Kominsky then

---

4. Henderson asks the court to find that, despite Kominsky's testimony that the WMS provided inaccurate information to him twice, including Henderson's case, Kominsky has actually received three inaccurate reports from the WMS. Henderson argues that the government admitted as much on page 28 of its Opposition (Docket No. 26) and asks the court to treat the Opposition as an admission of a party opponent. *See* Fed.R.Evid. 801(d)(2)(C). The actual language from the government's Opposition is "the government *expects* that Officer Kominsky will testify that he can recall only two *other* occasions in his six-year career in which he has found a warrant in WMS that should not have been there." Govt.'s Opp. at 28 (emphasis added). Regardless of whether "other" appears in this sentence due to a misunderstanding between the author and Kominsky or for some other reason, this is not an admission. It is a prediction of future testimony that proved to be inaccurate.

handcuffed Henderson and, after backup requested by Oliveira arrived, retrieved the weapon from Henderson's pants.

Kominsky placed Henderson in his cruiser. He then issued Alford a citation for operating without a license, driving with a defective windshield, and a marked lanes violation. Kominsky arranged for Alford to be transported to a CVS in Brockton.

Alford was not permitted to drive her own car home as her license was suspended. The police arranged for her car to be towed. Even if Henderson were not under arrest, he would not have been able to drive Alford's standard transmission vehicle. Thus, if Henderson had not been arrested, Kominsky would have offered both Alford and Henderson transportation to a safe location in Kominsky's cruiser, and arranged for Alford's automobile to be towed. It is Kominsky's practice to search every civilian who rides in his cruiser even if the person is not in custody.

Kominsky took Henderson back to the station, where Henderson was booked and Kominsky filled out paperwork. After Henderson was booked, Kominsky also issued a citation to him for failure to wear his seatbelt.

Approximately five days later, at Henderson's state court detention hearing, Kominsky learned from an Assistant District Attorney that the warrant which had prompted Henderson's arrest had been recalled. In fact, the case for which the warrant had been issued was dismissed in 1998. When the case was dismissed, the warrant should have been removed from the WMS.

The Trial Court of the Commonwealth of Massachusetts (the "Trial Court") is responsible for the operation and reliability of the WMS. This responsibility is established by a statute, M.G.L.A. ch. 276 § 23A.[5] The Trial Court's responsibility for the WMS is explained in a booklet published in the Spring of 2001 by the Administrative Office of the Trial Court entitled Warrant Management Handbook (the "Handbook"). Ex. 7. The Handbook "set[s] forth for the use of Trial Court personnel general principles and uniform practices and procedures for the entry of arrest warrants into WMS and for the management of that system." *Id.* at 4. The Handbook states that "[l]aw enforcement agencies are not allowed to modify WMS data entered by the courts." *Id.* at 16. The Handbook specifies a procedure for the release and cancellation of warrants. *See id.* at 18–21.

## III. ANALYSIS

Henderson raises three arguments in his motion to suppress. The first is that Kominsky acted unlawfully in stopping Alford's vehicle. The second is that Kominsky acted unlawfully in demanding Henderson's identification. The third is that the arrest and subsequent search of Henderson were unlawful because there was no valid warrant to justify the arrest and Henderson had committed no arrestable offense. The government responds that the stop of Alford's vehicle and the demand for Henderson's identification were lawful. It also asserts that the exclu-

---

**5.** M.G.L.A. ch. 276, § 23A states, in pertinent part, that:

Such [warrant] information and the name of the police department responsible for serving the warrant shall be entered by the clerk's office into a computer system to be known as the warrant management sys-

tem. . . . . Whenever a warrant is recalled or removed, the clerk's office shall, without any unnecessary delay, enter the same in the warrant management system which entry shall be electronically transmitted to the criminal justice information system.

sionary rule should not apply to items seized as a result of Kominsky's reliance on the WMS in arresting and searching Henderson. *See Arizona v. Evans*, 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) (recognizing a good faith exception to the exclusionary rule for objectively reasonable reliance by a police officer on a system similar to the WMS).

■ A police officer's stop of a vehicle and detention of its occupants implicates a passenger's Fourth Amendment right not to be subject to an unreasonable seizure. *See United States v. Kimball*, 25 F.3d 1, 5 (1st Cir.1994). In the circumstances of this case, the burden is on the government to prove that the warrantless stop of Alford's vehicle and the demand for identification from Henderson were reasonable. *See United States v. Acosta–Colon*, 157 F.3d 9, 14 (1st Cir.1998). The government has met this burden.

■ It was reasonable for Kominsky to stop Alford's vehicle. "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). An officer's actual motivations have no bearing on the constitutional issue. *See id.* at 813–14, 116 S.Ct. 1769.

■ Kominsky had two independent bases for stopping Alford. First, he had personally observed violations of M.G.L.A. Ch. 89, § 4A as Alford had crossed the center line at least twice. This constitutes probable cause. *Cf. Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 61

L.Ed.2d 343 (1979) (explaining that "probable cause" determination looks at whether facts within the officer's knowledge would be sufficient to warrant a prudent person's belief that an offense occurred). Second, after he received a response to his inquiry to the RMV, Kominsky had probable cause to believe that the vehicle was being driven by a person with a suspended license. *See Commonwealth v. Owens*, 414 Mass. 595, 599, 609 N.E.2d 1208 (1993) ("Objectively viewing the evidence, [the detective] had probable cause to believe, absent any indication otherwise, that the driver of the automobile was also the owner."). The period of the stop was brief and also reasonable. *See, e.g., United States v. Owens*, 167 F.3d 739, 749 (1st Cir.1999) (upholding fifty minute detention resulting from a *Terry* stop as officers responded reasonably to circumstances by performing computer checks and waiting for results).

■ Kominsky's demand for identification from Henderson was also reasonable. Because Henderson was not wearing a seatbelt, Kominsky was entitled to demand identification so that he could write a citation. *See* M.G.L.A. ch. 90 § 13A (requiring automobile passengers to wear safety belts); M.G.L.A. ch. 90C §§ 1–3 (describing procedure for issuing citations and requiring officer to fill out citations "as completely as possible").[6]

Even if Henderson had been wearing a seatbelt, Kominsky may have been entitled to demand identification from him. The First Circuit has not decided whether an officer may request identification from a passenger who is in a vehicle that was lawfully stopped. However, emphasizing a

---

**6.** It was also reasonable for Kominsky to attempt to determine whether Henderson was licensed to drive Alford's automobile from the scene of the stop because she was not. If Henderson had said he was licensed to drive her standard transmission vehicle, it would have been reasonable for Kominsky to check the accuracy of that representation. However, Henderson did not claim to be licensed to drive Alford's automobile. Therefore, Kominsky's demand for identification would not have been justified on this ground.

concern for officer safety, the Eleventh Circuit has held that police are permitted to require passengers in a lawfully stopped vehicle to produce identification. *See United States v. Purcell,* 236 F.3d 1274 (11th Cir.), *cert. denied,* — U.S. —, 122 S.Ct. 73, 151 L.Ed.2d 38 (2001). Because the demand for identification was justified by Henderson's failure to wear a seatbelt, the court need not decide this issue in this case. The court notes, however, that demanding identification from a person solely because he is a passenger in a vehicle that has been lawfully stopped appears to violate Massachusetts state law. *See Commonwealth v. Sinforoso,* 434 Mass. 320, 322 n. 2, 749 N.E.2d 128 (2001) ("[A] motor vehicle infraction usually justifies a request for identification of only the operator of the vehicle, not a request for identification of any passengers.").

■ There is now no dispute that there was not a valid warrant or other proper basis for Kominsky to arrest Henderson. There is a significant dispute as to whether the judicially crafted exclusionary rule operates to suppress the evidence subsequently seized or if the "good faith" exception recognized by the Supreme Court in *Evans* applies in this case. On this issue too, the burden of proof is on the government. *See United States v. Santa,* 180 F.3d 20, 25 (2d Cir.1999) ("[W]e are mindful that where, as here, the government asserts the good faith exception to the exclusionary rule, '[t]he burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance.'") (quoting *United States v. George,* 975 F.2d 72, 77 (2d Cir.1992)); *People v. Willis,* 28 Cal.4th 22, 36–38, 120 Cal.Rptr.2d 105, 46 P.3d 898 (2002) ("Where, as here, the prosecution invokes the good faith exception, the government has the burden to prove that exclusion of the evidence is not necessary because of

that exception.") (internal punctuation omitted).

Therefore, to defeat Henderson's motion to suppress evidence obtained as a result of what has proved to be an unlawful search and seizure, the government must prove that it was objectively reasonable for Kominsky to rely on the WMS in arresting Henderson and searching him. *See Evans,* 514 U.S. at 14–16, 115 S.Ct. 1185; *Santa,* 180 F.3d at 25; *Willis,* 28 Cal.4th at 37, 120 Cal.Rptr.2d 105, 46 P.3d 898. More specifically, the government must prove that a reasonably well trained police officer would have relied on the WMS. *See United States v. Leon,* 468 U.S. 897, 922 n. 23, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) ("[O]ur good faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known the search was illegal ....."); *Evans,* 514 U.S. at 16–18, 115 S.Ct. 1185 (O'Connor, J., concurring).

In writing for the majority in *Evans,* Chief Justice Rehnquist stated that "[a]pplication of the *Leon* framework supports a categorical exception to the exclusionary rule for clerical errors of court employees." *Evans,* 514 U.S. at 16, 115 S.Ct. 1185. However, as Justice O'Connor and her concurring colleagues, Justices Souter and Breyer, explained in *Evans:*

> In limiting itself to that single question [of clerical errors of court employees], however, the Court does not hold that the court employee's mistake in this case was necessarily the *only* error that may have occurred and to which the exclusionary rule might apply. While the police were innocent of the court employee's mistake, they may or may not have acted reasonably in their reliance on the recordkeeping system itself. Surely it would not be reasonable for the police to rely, say, on a recordkeeping system, their own or some other agen-

cy's, that has no mechanism to ensure its accuracy over time and that routinely leads to false arrests, even years after the probable cause for any such arrest has ceased to exist (if it ever existed). *Id.* at 16–17, 115 S.Ct. 1185 (O'Connor, J., concurring) (emphasis in original).

Thus, *Evans* instructs that where the sole error is made by court employees who are not adjuncts of law enforcement, the exclusionary rule does not operate to suppress evidence seized by a reasonably trained police officer who relied on information the court employees erroneously provided. *Id.* at 14–17, 115 S.Ct. 1185. However, if a police officer did not *reasonably* rely on the faulty recordkeeping system, that would be a second error that would require suppression. *Id.* at 17, 115 S.Ct. 1185 (O'Connor, J., concurring).

The instant case, however, involves only an error by the Trial Court. The WMS is established and maintained solely by the Trial Court. *Cf. Santa,* 180 F.3d at 29. There is no evidence to suggest that the Trial Court employees responsible for the system are "adjuncts to the law enforcement team engaged in the often competitive enterprise of ferreting out crime." *Evans,* 514 U.S. at 15, 115 S.Ct. 1185; *cf. Willis,* 28 Cal.4th at 38–51, 120 Cal. Rptr.2d 105, 46 P.3d 898 (analyzing whether various personnel in the California De-

partment of Corrections are adjuncts of law enforcement). "[T]he exclusionary rule was historically designed as a means of deterring police misconduct, not mistakes by court employees." *Evans,* 514 U.S. at 14, 115 S.Ct. 1185; *accord Santa,* 180 F.3d at 30; *Willis,* 28 Cal.4th at 38, 48, 120 Cal.Rptr.2d 105, 46 P.3d 898. As in *Evans,* there is in the instant case "no evidence that court employees are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion." *Evans,* 514 U.S. at 14–15, 115 S.Ct. 1185.

Moreover, the evidence establishes that a reasonably well trained police officer in Massachusetts would regard the WMS as reliable. The degree to which officers can rely on various databases providing information concerning warrants is a subject taught at the Police Academy. Officers like Kominsky are taught to be skeptical of certain databases, but educated to understand that the WMS is reliable. Kominsky's personal experience was consistent with what he was taught concerning the WMS. There is no evidence that the experience of other officers was any different or that the WMS was otherwise unreliable.[7] Rather, the Handbook indicates that at about the date of Henderson's arrest the Trial Court had established procedures to ensure its reasonable reliability.[8]

---

7. The government argues that the court should grant a presumption of regularity to the WMS. *See* Govt.'s Second Supp. Opp. at 1–4. Citing Supreme Court precedent for the proposition that final judgments of courts are entitled to a presumption of regularity, the government asks this court to adopt a rule that until a defendant makes a preliminary showing that the WMS "has no mechanism to ensure its accuracy over time" or that the WMS "routinely leads to false arrests," the WMS is presumptively reliable because it is run by the Massachusetts courts. *See id.* This court does not agree. Rather, the court has assumed that the burdens of both produc-

tion and proof on this issue are on the government.

8. Henderson was arrested on May 10, 2001. The Handbook is dated "Spring, 2001." *See* Ex. 7. The evidence does not indicate whether it describes pre-existing practice or, if it was intended to establish new procedures, whether they were implemented before May 10, 2001. These questions are, however, not material. The Handbook is not essential to the court's conclusion that the government has satisfied its burden of proof.

In the circumstances, the government has proved that it was objectively reasonable for Kominsky to have relied on the WMS.

Having found that the traffic stop and demand for identification were lawful and that the exclusionary rule does not operate to suppress the evidence at issue, the court need and does not decide the government's inevitable disclosure argument. *See* Govt.'s Supp. Opp. at 5–6. The government asserts that the evidence should not be suppressed as Kominsky would have inevitably discovered Henderson's weapon because: (1) Henderson could not have driven Alford's standard transmission vehicle; (2) Kominsky would have offered Henderson transportation; and (3) Kominsky searches every civilian who rides in his cruiser even if the person is not in custody. *See, e.g., Nix v. Williams,* 467 U.S. 431, 448, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). However, it may not be a foregone conclusion that Henderson would have submitted to a search. He could have walked away from the offered ride. *Compare United States v. Silvestri,* 787 F.2d 736, 744 (1st Cir.1986) (requiring that disclosure be "truly inevitable") *with United States v. Felix,* 134 F.Supp.2d 162, 175 (D.Mass. 2001) ("As a general matter, a consent search itself can hardly be deemed inevitable given the consenting party's power to revoke her consent at any time.").

## IV. ORDER

In view of the foregoing, it is hereby ORDERED that Henderson's Motion to Suppress (Docket No. 19) is DENIED.